STATE EX REL. INTERSTATE AIR-PARTS, INC. AND
OTHERS v. MINNEAPOLIS-ST. PAUL METRO-
POLITAN AIRPORTS COMMISSION.
STATE EX REL. CEDAR FLYING SERVICE, INC. v. SAME.[1]

January 4, 1947.

Nos. 34,342, 34,343.

[1]Reported in 25 N. W. (2d) 718.

*Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for appellant.

*Stinchfield, Mackall, Crounse & Moore* and *M. Dana Nicholson,* for respondents Interstate Air-Parts, Inc., Vida Shaffer, and Leah Cook.

*Fred K. Gage,* for respondent Cedar Flying Service, Inc.

PETERSON, JUSTICE.

These appeals bring up for review two orders[5] of the district court for Ramsey county in certiorari proceedings reversing two orders of the Minneapolis-St. Paul Metropolitan Airports Commission refusing to approve the operation of relators' properties as public airports.

In one case the relators, Interstate Air-Parts, Inc., Vida Shaffer, and Leah Cook, applied to the state commissioner of aeronautics for a license to operate as a public airport a property known as the Nicollet Airport, which the commissioner denied because the Minneapolis-St. Paul Metropolitan Airports Commission refused to approve the operation of the airport. In the other case the relator, Cedar Flying Service, Inc., made a similar application for a license to operate as a public airport a property known as Cedar Airport, which was denied for the same reason. Both of these airports are located in a general southerly direction and approximately ten miles from the city hall of Minneapolis and consequently are well within the 25-mile limit therefrom to which we shall presently refer. For convenience, we shall refer to the state commissioner of aeronautics as "the commissioner," the Minneapolis-St. Paul Metropolitan Airports Commission as "the commission," the parties in the first-mentioned case by the name of their airport, viz., "Nicollet," and the party in the other case by the name of its airport, "Cedar."

The licenses were sought under § 360.018, subds. 1 (3) and 6 to 11, inclusive, authorizing the commissioner to approve and license airports annually in accordance with rules and regulations adopted by him, and requiring all airports except those specified in subd. 9 to

---

[5] Each order contains findings of fact, conclusions of law, and a direction for the entry of judgment. Upon the authority of Johnson v. City of Minneapolis, 209 Minn. 67, 295 N. W. 406, we treat the orders as being of the sort intended by statute to be final determinations of the proceedings and as such appealable.

be licensed by the commissioner before they shall be used or operated. The commissioner, deeming the approval by the commission of the operation of the proposed public airports to be necessary, referred the applications to the commission for such approval.

The statutory provisions relative to the powers of the commissioner, so far as here pertinent, are found in the Aeronautics Code. Section 360.018, subd. 9, provides that subds. 6, 7, and 8 of that section, requiring airports to be licensed, shall not apply to the airport of any public corporation created in and for contiguous cities of the first class of this state, and:

"* * * No airport, restricted landing area or other air navigation facility shall be acquired or operated within 25 miles of the city hall of either of two contiguous cities of the first class for which a public corporation has been created pursuant to Laws 1943, Chapter 500, without the consent of such corporation."

As we shall show presently, this subdivision applies to the commission.

The commission was created under the Metropolitan Airports Commission Act. The purposes of the statute and of the commission are fully stated in Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, and Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241, where the provisions of the statute were set forth and its constitutionality was sustained. See, People ex rel. Curren v. Wood, 391 Ill. 237, 62 N. E. (2d) 809, 161 A. L. R. 718, and annotation at p. 733.

For present purposes, it is sufficient to say that the statute authorizes the creation of a public corporation as a metropolitan airports commission in and for any two contiguous cities of the first class; and that the commission is authorized to exercise the powers granted it at any place within 25 miles of the city hall of either city. Under § 360.111,[6] the commission is authorized, if it so determines, to exer-

---

[6]"360.111. **Corporation to exercise control and jurisdiction over existing airports.** After taking over operation and maintenance of the municipally-owned airports, in accordance with the provisions of Section 360.109, subdivision 2, the corporation, if it so determines, shall exercise control and jurisdiction over any other airport within 25 miles of the city hall of either city,

cise control and jurisdiction over any other airport within 25 miles of the city hall of either of the cities. The cited section further provides that no airport *shall be acquired or operated* within that area without the *approval* of the commission. Pursuant to such authorization, the commission took over the municipal airports in Minneapolis and St. Paul and by appropriate corporate action determined to exercise such control and jurisdiction over other airports within the area mentioned, which we shall refer to as the "metropolitan area."

It is apparent that the commissioner acted upon the assumption that he was not authorized to approve and issue a license for any public airport situated within the metropolitan area unless the commission first approved the operation of such airport, for the reasons that the Aeronautics Code (§ 360.018, subd. 9, which is part of the section relating to the approval and licensing of airports), expressly provides that no airport shall be acquired or operated in such area without the *consent* of the commission and because the Metropolitan Airports Commission Act (§ 360.111) also expressly provides that no airport shall be acquired or operated within such area without the *approval* of the commission. Since the words "consent" and "approval" in this connection are synonymous (6 C. J. S., pp. 127-128) and since the Metropolitan Airports Commission Act uses the word "approval," we shall use that word or some form of it in referring to the power of the commission to *approve* and to *consent*.

The commission held extended hearings in connection with the question as to whether it should approve or disapprove the operation of these airports. Among other things, it appeared at the hearing that the Cedar airport is 3.5 miles from Wold-Chamberlain Field, a large airport operated by the commission. Nicollet airport is 4.8 miles from Wold-Chamberlain Field. Wold-Chamberlain Field represents a capital investment of over $3,500,000. Contemplated improvements and expansion to meet the needs of increasing air traffic involve a further investment of many more millions of dollars. It

---

and no airport shall be acquired or operated within that distance of the center of either city without the approval of the corporation."

is what is known as an "instrument airport," which means that operations there are possible by use of instruments without relying on sight. Nicollet and Cedar airports are what are known as "contact airports," which means that landing and taking off from them is controlled by means of visual reference to the ground. Cedar represents an investment of about $41,500, and Nicollet an investment of about $39,000.

Because of the proximity of the Nicollet and Cedar airports to Wold-Chamberlain Field and the flying patterns necessary for landing and the taking off of aircraft at these airports, the commission concluded that the operation of Nicollet and Cedar involved danger to aircraft taking off and landing at Wold-Chamberlain and, in the interests of public safety, refused to give its approval to the operation of the Nicollet and Cedar airports. The facts in connection with this phase of the case will be stated when we come to consider the question whether the commission acted arbitrarily and capriciously in refusing to give its approval to the operation of these airports.

We shall not state all the points and contentions which have been raised by the parties or how they have been raised, because merely to catalogue them would prolong this opinion beyond any reason. We have carefully considered all the points and contentions and think that they raise the following legal questions:

(1)  Does the commissioner have the power to approve and license a public airport in the metropolitan area within 25 miles of the city hall of either Minneapolis or St. Paul without the commission's approval of the acquisition or operation of the airport?

(2)  Does the commission's approval power extend to properties used as public airports prior to the effective date of the Metropolitan Airports Commission Act (July 6, 1943), but not actually used and licensed as such on that date?

(3)  Is the commission justified in refusing to approve the operation of an airport too close to Wold-Chamberlain Field for safety?

(4)  Does the statute granting the approval power lack definitive standards governing the exercise of the power so as to constitute an unconstitutional delegation of legislative power?

(5) Did the commission in denying approval of the operation of relators' airports act arbitrarily and capriciously?

(6) Does the commission's refusal to approve the operation of relators' airports constitute a deprivation of their property without due process of law?

(7) Aside from whether such refusal constitutes a deprivation of relators' property without due process of law, is the commission required as a matter of law to acquire by exercise of the right of eminent domain the right to discontinue hazards to operations at Wold-Chamberlain Field arising from the proximity of relators' airports rather than to accomplish that result without compensation to relators by refusing, in the exercise of the police power, to approve the operation of their airports?

■ The commissioner has the power to approve and license an airport in the metropolitan area. The commission has the power to approve the acquisition or operation of any proposed airport, and no airport can be legally acquired or operated without such approval. Here, we are not concerned with an acquisition, but only with the operation of airports. It is true, as relators contend, that the Aeronautics Code confers upon the commissioner broad licensing and regulatory powers, including those of approving and licensing airport sites,[7] aircraft,[8] airmen,[9] flying instructors,[10] and air schools and aeronautics ground instructors[11]; that the commissioner is authorized to charge and collect all license fees,[12] to encourage, foster, and assist in the development of aeronautics,[13] to encourage the establishment of airports,[14] to design and establish a state airways system,[15] and to issue rules, regulations, and orders to insure safety of persons using or traveling in aircraft, which shall be supreme throughout the state notwithstanding any inconsistent rules and

[7] § 360.018, subd. 1(3).
[8, 9, 10] § 360.018, subd. 1(1).
[11] § 360.018, subd. 1(2).
[12] § 360.018, subd. 1(3).
[13, 14] § 360.015, subd. 1.
[15] § 360.015, subd. 6.

regulations adopted by any municipality[16] (but, as the commission points out, the statute[17] provides: "Nothing herein contained shall be construed to limit any powers specifically granted to metropolitan airports commissions by Laws 1943, Chapter 500 [Metropolitan Airports Commission Act] § 7, subdivisions 1 through 17"); that it is the duty of the commissioner to enforce the Aeronautics Code and rules and regulations promulgated thereunder,[18] and that he is empowered to revoke for cause airport licenses.[19]

Relators contend that, because the statute expressly vests in the commissioner the power to approve and license airports and because the other provisions enumerated confer broad and comprehensive powers upon the commissioner, a legislative intent is manifested that such powers may be exercised without the commission's approval of the operation of such airports; and that whatever powers are conferred upon the commission by the Metropolitan Airports Commission Act are not limitations upon the powers of the commissioner or any license issued by him, but are purely regulatory for the purpose of enabling the commission to control and regulate airports operated by it.

But the commission points out that it also has broad and comprehensive powers and that we so held in Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, *supra*. It points out in particular that both the Aeronautics Code and the Metropolitan Airports Commission Act specifically provide that no airport shall be operated in the metropolitan area without the commission's approval; that under § 360.111 it has control and jurisdiction over other airports within the metropolitan area; that under § 360.107, subds. 1 through 17, it is a public corporation endowed with comprehensive police power with respect to airports within such area, including that granted by subd. 17 to make, adopt, and enforce rules, regulations, and ordinances deemed expedient; and that the power of the commissioner to approve and license airports is to be construed by express provi-

[16, 17]§ 360.015, subd. 3.

[18]§ 360.015, subd. 10.

[19]§ 360.018, subd. 10.

sion of § 360.015, subd. 3, so as not to limit powers "specifically granted" to the commission. The commission contends that, while the commissioner has the power to license airports, no airport can be licensed by him in the metropolitan area unless the operation of the airport has been approved by it. It asserts:

"True, it is for the State Commissioner of Aeronautics to license airports, but we insist that as to airports within 25 miles of the city hall of either of the cities of Minneapolis or St. Paul, he cannot license without the approval or consent of the Commission. *So, in final analysis, the licensing power as we see it, as to airports within the metropolitan area lies with the Commission.*" (Italics supplied.)

It is obvious that to sustain relators' contention that the commissioner has the power to license airports located in the metropolitan area without the commission's approval of the operation of such airports would entirely nullify the provisions of both the Aeronautics Code and the Metropolitan Airports Commission Act that no airport shall be acquired or operated in the metropolitan area without the commission's approval. Likewise, it is equally obvious that to sustain the commission's contention that in the final analysis it has the power to license airports in the metropolitan area would be to hold that it has power which was never granted to it and which was expressly vested in the commissioner. Approval of an act is one thing, and the act approved is another; they are separate acts of different actors. Simpson v. City of Marlborough, 236 Mass. 210, 127 N. E. 887. The function of issuing a license is an entirely separate one from that of approving the operation or activity licensed. Therefore, the commissioner's power to license airports is entirely independent and separate from the approval power of the commission. And the *approval* power of the commission is entirely independent of and separate from the licensing power of the commissioner. The conflict, if any, between the powers of the commission and the commissioner should be resolved by resort to rules of statutory construction.

Statutes relating to the same general subject matter are *in pari materia* and are to be construed together, because presumably they

were enacted in accord with the same general legislative policy and were intended to be a harmonious and uniform system of law. State v. Bolsinger, 221 Minn. 154, 21 N. W. (2d) 480; State ex rel. Carlton v. Weed, 208 Minn. 342, 294 N. W. 370. Where statutes contain general and special provisions which seemingly are in conflict, the two should be construed together and, if possible, harmonized and reconciled and effect given to both. In such cases the general provision will be taken to affect only such cases within its general language as are not within the language of the special provision. Aslakson v. State Dept. of Highways, 217 Minn. 524, 15 N. W. (2d) 22.

The provisions of the Aeronautics Code and of the Metropolitan Airports Commission Act relate to the subject of aviation. Because that is true, they are *in pari materia*. The powers of the commissioner to license airports and to make rules and regulations are of general import. They operate generally throughout the state. The provisions to the effect that no airport shall be acquired or operated within the metropolitan area without the approval of the commission are special in nature, because they are restricted and limited in operation to the metropolitan area. That the legislature intended that the provision in the Metropolitan Airports Commission Act, to the effect that no airport should be acquired or operated within the metropolitan area without the approval of the commission, should be given full effect is manifested by the fact that this provision, which first appeared only in the Metropolitan Airports Commission Act (L. 1943, c. 500, § 10), but not in the Aeronautics Code in its original form (L. 1943, c. 653), was, notwithstanding the fact that it appeared in the Metropolitan Airports Commission Act, included in the Aeronautics Code (§ 360.018, subd. 9) when it was amended and rewritten in 1945 (L. 1945, c. 303, § 6, subd. 9), with the consequence that the legislature has twice adopted this provision in these two separate but related acts, and by the fact that it was further provided in the Aeronautics Code (§ 360.015, subd. 3) that the commissioner's power to approve and license airports should not be construed to limit powers "specifically granted" to the commission. The power to approve the acquisition and operation of airports within the metropoli-

tan area is, as has been pointed out, one of the powers "specifically granted" to the commission. Hence that power is not limited by the commissioner's power to approve and license airports. The provisions with respect to the powers of the commissioner to approve and license airports and those with respect to the power of the commission to approve the operation of any airport in the metropolitan area can be harmonized and effect given to each by construing the commissioner's power to confer upon him sole power to approve and license airports and the commission's power to confer upon it the power to approve the acquisition and operation of any airport within the metropolitan area. We so hold. Where the commission refuses to approve the acquisition or operation, the commissioner's license, if one should be issued, would not become operative. The purpose of a license is to make lawful what would be unlawful without it. 33 Am. Jur., Licenses, § 2; 37 C. J., Licenses, § 1. Approval and licensing of an airport within the metropolitan area by the commissioner could not make the acquisition or operation of it lawful unless the commission approved not the license, but the acquisition or operation. Where the commission refuses to approve the acquisition or operation of an airport located within the metropolitan area, the legislature intended that the commissioner should, as he did here, refuse to issue a license for it.

Approval by one public authority as the condition of action proposed to be taken by another is a common practice. Where such approval by the one is required and not obtained, action by the other conditioned by such approval is illegal and void. State ex rel. Foley Bros. & Kelly v. Minnesota Tax Comm. 103 Minn. 485, 115 N. W. 647 (approval by county board and county auditor a "condition precedent" to abatement of tax assessment by state tax commission); Clarke v. Board of County Commrs. 66 Minn. 304, 69 N. W. 25 (approval by same county officials a condition precedent to similar action by state auditor); Ecker v. Western Pacific R. Corp. 318 U. S. 448, 63 S. Ct. 692, 87 L. ed. 892 (approval by interstate commerce commission a condition precedent to court approval of a plan for reorganization of railroad corporation in bankruptcy proceedings);

United States v. Lowden, 308 U. S. 225, 60 S. Ct. 248, 84 L. ed. 208 (approval by interstate commerce commission a condition precedent to consolidation of common carriers or leases of one common carrier by another) ; Coyne v. Alcoholic Beverages Control Comm. 312 Mass. 224, 44 N. E. (2d) 692, and McCarten v. Sanderson, 111 Mont. 407, 109 P. (2d) 1108, 132 A. L. R. 1229, and annotation at p. 1235 (approval by a state authority for issuance of a liquor license by a local one or vice versa, as the case might be, a condition precedent to issuance of a license). Similar approvals are required with respect to some school matters. Gustafson v. Wethersfield Twp. High School Dist. 319 Ill. App. 255, 49 N. E. (2d) 311; Harris v. Board of Education, 216 N. C. 147, 4 S. E. (2d) 328. While it is true that in the cited cases and those cited in the annotation in 132 A. L. R. 1235, the approval of one official as a condition precedent to action by another with respect to a particular matter was required as part of processing the particular matter, such as the abatement of an assessment or the issuance of a liquor license, and that here the approval of the commission is no part of the processing of licenses for airports, the governing principle in both cases is much the same. In the one case, the approval by one public authority conditions the validity of the very act done by another. In the other case—that is here—such approval conditions the right to do what the other public authority otherwise could license. Therefore, our conclusion that the commissioner has the power to approve and license airports, but that no airport can be acquired or operated in the metropolitan area without the commission's approval, seems inescapable. In so holding, we reject that part of the commission's contention that the power to license airports within the metropolitan area "lies with the Commission."

Decision here is without prejudice to the question whether the commission has separate power to license airports within the metropolitan area in virtue of the powers granted it by § 360.111 to exercise control and jurisdiction over other airports in such area, and by § 360.107, subd. 17, to adopt regulations and ordinances. See, City of St. Paul v. Dow, 37 Minn. 20, 32 N. W. 860, 5 A. S. R. 811;

38 Am. Jur., Municipal Corporations, § 327; 33 Am. Jur., Licenses, § 17. There is ample authority for the proposition that local authorities may be authorized to exercise concurrently with the state authority licensing power with respect to the same subjects. See, 37 C. J., Licenses, § 31. The commission has not attempted to exercise such power. Since that is true and since any such power does not affect the admitted power of the commissioner to license airports, no question concerning the commission's power in the respect mentioned is before us.

■ While the parties have argued at length the question whether the commission's *approval* power applies to airports "existing" on the effective date of the Metropolitan Airports Commission Act (July 6, 1943), we think the facts do not raise that question. Neither Nicollet nor Cedar was an "existing" airport on that date, because they then were neither used nor licensed as airports. Nicollet had been licensed and used as an airport (landing field) prior to July 1942, when the military authorities prohibited all flying there. On July 6, 1943, it was not licensed or used as an airport. On the contrary, from June 1943 to January 1945, when it filed its application for the license in question, it was used to manufacture airplane parts. Cedar had been licensed and operated as an airport (landing field) until sometime in 1942, when it was taken over by the Navy and used by it until June 30, 1945. It was not licensed or used as an airport in 1943. The application for the license was made in September 1944, over one year subsequent to the effective date of the statute. A license confers upon the licensee the right to engage in the licensed business only for the term specified in the license. A prior expired license is *functus officio* and confers no rights upon the licensee named therein, except in certain cases where by statute it entitles him to a renewal upon compliance with specified conditions. State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L.R.A.(N.S.) 1272, 10 Ann. Cas. 398. Relators do not claim or have such statutory license renewal rights. They are applying for new licenses. In such cases, their application for a license stands upon the same basis as if they never had been licensed. Matter of Tammaro v. Bruckman, 173

Misc. 958, 18 N. Y. S. (2d) 689. See, State ex rel. Rose Brothers L. & S. Co. Inc. v. Clousing, 198 Minn. 35, 268 N. W. 844; Diamond Glue Co. v. United States Glue Co. 187 U. S. 611, 23 S. Ct. 206, 47 L. ed. 328; 50 Am. Jur., Statutes, § 476.

■ The commission is justified in refusing to approve the operation of an airport too close to Wold-Chamberlain Field for safety. The commission was created as a public corporation to take over and operate Wold-Chamberlain Field and other municipally owned airports in Minneapolis and St. Paul. An enormous air traffic—local, interstate, and international—moves in and out of that field. The safety of such traffic is of paramount importance and is one of the purposes for which the commission was created. As said in Erickson v. King, 218 Minn. 98, 105, 15 N. W. (2d) 201, 205, *supra:*

"Examining the provisions of [L. 1943] c. 500, we discern its paramount purpose to be integration of the control of air traffic in the interest of public safety, not only as to the traffic but as to the people of the state. Subject to the constitutional powers of congress, the state government is responsible to the people for the exercise of its police power in such manner that the public welfare is best served."

Refusal to approve the operation of airports likely to create dangers to operations at Wold-Chamberlain Field is in furtherance of the purposes for which the commission was created. That being so, the commission but performs a duty resting upon it when it refuses to approve the operation of an airport too close to Wold-Chamberlain Field for safety.

■ The statute granting the approval power is not unconstitutional upon the ground that it lacks definitive standards governing the exercise of the power and for that reason unconstitutionally delegates legislative power. Relators' contention is that the words "approval" and "consent," used to designate the commission's approval power, in themselves import no standards governing the exercise of the power; that, in effect, for lack of definitive standards, the statute delegates unrestrained and uncontrolled power to the commission which it is authorized to exercise arbitrarily at its will and caprice; and that, consequently, it is unconstitutional as being

in effect a delegation of power to legislate. They do not point out in what respects the standards could be made more definite. The commission contends that there is no delegation of legislative power at all if the words "approve" and "consent" are construed, as they should be, in the light of the statute as a whole, because in that event the statute itself prescribes the standards claimed to be lacking; and that, if there is in fact a delegation of power to legislate, it is a constitutional one, because whatever delegation there is consists of delegation to a public corporation of power to legislate with respect to a particular subject matter. We think that both of the commission's contentions must be sustained.

The words "approve" and "consent" do not stand in isolation and are not to be construed as if they did. They are parts of the statute. The statute should be construed as a whole. Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, *supra*. There, we applied the rule to the Metropolitan Airports Commission Act. So construed, the other parts of the statute not only communicate meaning to the words "approval" and "consent," but prescribe the standards for exercising the approval power claimed to be lacking. American Power & Light Co. v. Securities and Exchange Comm. 329 U. S. 90, 67 S. Ct. 133, 91 L. ed. —; National Broadcasting Co. v. United States, 319 U. S. 190, 63 S. Ct. 997, 87 L. ed. 1344; United States v. Lowden, 308 U. S. 225, 60 S. Ct. 248, 84 L. ed. 208. The cited cases afford striking examples of the application of the rule. For example, in the American Power & Light Co. case it was held (329 U. S. 104, 67 S. Ct. 142, 91 L. ed. —) that, when considered in the light of the securities and exchange act as a whole, sufficiently definite standards were prescribed by a grant of power to the securities and exchange commission to determine whether a corporate structure "unduly" or "unfairly or inequitably distribute[s] voting power among security holders." In the National Broadcasting Co. case, the rule was applied to sustain the power of the federal communications commission to make a regulation of chain radio broadcasting stations as "public interest, convenience, or necessity" may require. In the Lowden case, power of the interstate commerce commission to determine whether a consoli-

dation of railroad or the lease of one by another would promote the "public interest" was upheld under the rule. In New York Central Sec. Corp. v. United States, 287 U. S. 12, 53 S. Ct. 45, 77 L. ed. 138, where the powers of the interstate commerce commission were involved, Mr. Chief Justice Hughes speaking for the court said (287 U. S. 24, 53 S. Ct. 48, 77 L. ed. 145) :

"Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the 'public interest.' It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary."

Cases cited by relator Cedar such as State v. Oliver I. Min. Co. 207 Minn. 630, 292 N. W. 407; State v. G. N. Ry. Co. 100 Minn. 445, 111 N. W. 289, 10 L.R.A.(N.S.) 250; and Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. ed. 446, are not in point. They involve situations where the particular delegation involved the power to legislate and not, as here, a delegation of power to be exercised according to standards prescribed by other parts of the statute under which the delegation was made. The difference is that the one involves the power to make law; the other requires action prescribed by law.

That the delegation to municipal or other public corporations of specified powers to enable such corporations to legislate with respect to particular matters to which such powers pertain does not constitute an unconstitutional delegation of legislative power is settled in this state by such decisions as Harrington v. Town of Plainview, 27 Minn. 224, 6 N. W. 777, and State ex rel. Luley v. Simons, 32 Minn. 540, 21 N. W. 750, where the question received exhaustive consideration. Our cases are collected in 4 Dunnell, Dig. § 6692, note 57. In the Simons case (32 Minn. 543, 21 N. W. 751) we said:

"* * * As said by this court in State v. Young, 29 Minn. 474, 551 [9 N. W. 737], it is a principle not questioned that, except when

authorized by the constitution, as in respect to municipal corporations, the legislature cannot delegate legislative power. The power of local legislation commonly bestowed on municipal corporations does not trench upon the maxim [legislative powers cannot be delegated], since this is authorized, impliedly at least, by the constitution itself; and the maxim itself is to be understood in the light of an immemorial practice which has always recognized the policy and propriety of vesting in such corporations these powers. As before remarked, municipal corporations are created for this purpose, as aids to the state government in the business of municipal rule. Cooley, Const. Lim. 140."

■ The commission did not act arbitrarily or capriciously in refusing to approve the operation of relators' airports. Judicial review of the action taken by public corporations and administrative agencies is limited to determining whether the corporation or agency had power to act with respect to the particular matter, whether it acted under a correct theory of applicable law, and whether the facts found, or presumably found, by it as a basis for the action taken are sustained by evidence. State ex rel. Rockwell v. State Board of Education, 213 Minn. 184, 6 N. W. (2d) 251, 143 A. L. R. 503; 1 Dunnell, Dig. & Supp. §§ 1397 and 1402. Here, refusal of approval was based upon considerations of public safety. Measures taken to protect public safety are police regulations which the commission is authorized to adopt. Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, *supra*. The mode and extent of police regulation are for the public authority exercising police power. It is not for the courts to determine either the wisdom or expediency of such measures. Sverkerson v. City of Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944.

Here, as we have pointed out, the commission in exercising the power to refuse approval exercised power possessed by it and proceeded under a correct theory as to what its powers were. The only remaining question is whether there was evidence to sustain the finding, upon which the commission based its finding, that relators'

airports were so close to Wold-Chamberlain Field as to constitute flying hazards.

The evidence with respect to the fact was in conflict. Because of its volume, we summarize it. It showed that in taking off and landing at Wold-Chamberlain Field aircraft navigate not only above the field itself, but also over surrounding areas; that clear flying space for a distance of four miles from the center of the field is necessary to afford adequate room for safe flying; that in taking off and landing aircraft follow certain courses in the air called "patterns," which are worked out to safely channel aircraft traffic; that similar patterns would be necessary to regulate aircraft traffic at Nicollet and Cedar; that because of the proximity of those fields to Wold-Chamberlain Field the air-flight patterns of the latter would overlap those to be used at Nicollet and Cedar if aircraft flying were permitted at those fields; that it was possible to navigate aircraft in the overlapping air-flight patterns if all aircraft kept within the patterns assigned to them and pilots always observed regulations; and that, because the success of the use of overlapping air-flight patterns depends on pilots keeping within patterns assigned to their use and upon their observing rules and regulations, and because any failure on the part of pilots in either respect might cause a collision of aircraft in the air, the use of overlapping air-flight patterns was attended with public danger that ought to be eliminated. In this connection, it was pointed out that the tendency is to use larger and speedier aircraft, with increase of resulting dangers to be apprehended, and that because of such dangers the operation of Nicollet and Cedar as airports would seriously interfere not only with the operation but with the contemplated expansion of Wold-Chamberlain Field, which would bring it closer to them.

To show that there was no real danger under the circumstances, relators showed that other airports are operated with approval of the Federal Civil Aeronautics Authority closer to each other than the airports here involved and without mishaps of any sort caused by such proximity. For example, it was shown that there are three airports at Washington, D. C., located within a radius of two miles;

two airports in Chicago two and one-half miles apart; two airports in Kansas City separated by a river; two airports at Dayton, Ohio, four miles apart; and many similar situations in other cities. Aside from the showing that there are numerous airports in other cities situated more closely to each other than Nicollet and Cedar are to Wold-Chamberlain, there was no showing that such proximity did not give rise to dangers in aircraft navigation, which the commission found would arise from the proximity of Nicollet and Cedar to Wold-Chamberlain if aircraft navigation should be permitted at those fields, or that proximity of airfields in other cities did not in fact create flying hazards which had to be overcome by measures which might fail because of the human and other factors involved. It might be that flying at the fields mentioned is attended with public dangers that have been avoided so far and that it would be in the interest of public safety to eliminate such dangers, if any, by a further separation of those fields.

Whatever may be the fact with respect to public safety under the circumstances, we think that the evidence supports the commission's view that the operation of Nicollet and Cedar would be attended with dangers to the operation of Wold-Chamberlain Field. The fact that there was no evidence of aircraft collisions or accidents at other airfields is not conclusive evidence that flying there was not attended with dangers arising from the fact of their proximity. Regulatory authorities ought not wait until the consequences of a present danger are demonstrated by the happening of a disaster before taking measures to suppress it. It is peculiarly the function of the commission to resolve such conflicts as we have here. After all, our knowledge of the science of aviation is limited. We do not have what has been called the "technical competence" to determine the existence of facts which depend upon the practical application of the principles of aviation to such a complicated fact situation as we have here. The judicial function is at an end when it appears that there is evidentiary support for the commission's finding. National Broadcasting Co. v. United States, 319 U. S. 190, 63 S. Ct. 997, 87

L. ed. 1344, *supra;* Board of Trade v. United States, 314 U. S. 534, 62 S. Ct. 366, 86 L. ed. 432.

■ The commission's refusal to approve the operation of relators' properties as airports does not constitute a deprivation of their property without due process of law. Regulations of the commission in the interests of public safety involve an exercise of the police power. Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, *supra.* Prevention of a use of property by an exercise of the police power does not involve an unconstitutional deprivation of private property and is uncompensable. Alexander Co. v. City of Owatonna, 222 Minn. 312, 24 N. W. (2d) 244.

■ Aside from whether the refusal to approve the operation of relators' properties as airports constituted a deprivation of their property without due process of law, the commission was not required as a matter of law to acquire by the exercise of the power of eminent domain the right to discontinue hazards to operations at Wold-Chamberlain Field arising from the proximity of relators' properties thereto rather than to accomplish that result by refusal, in the exercise of the police power, to approve the operation of their properties as airports. The refusal to approve the operation of the properties as airports is complained of because it prevented relators from obtaining licenses or renewal of licenses for the purpose from the commissioner. That is no ground entitling them to compensation. Refusal to grant a license or to renew one is not a taking of property without compensation. Trinity Methodist Church, South, v. Federal Radio Comm. 61 App. D. C. 311, 62 F. (2d) 850; 29 C. J. S., Eminent Domain, § 10. See, State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L.R.A.(N.S.) 1272, 10 Ann. Cas. 398, *supra.* Whether a public authority possessing the police power and the power of eminent domain should exercise the one or the other to accomplish a given objective rests in the exercise of its sound discretion. The police power involves regulation of use of property without appropriation of it. The power of eminent domain involves a taking of the property. 29 C. J. S., Eminent Domain, § 6. Perhaps, as relators contend, a taking, because it necessitates payment

of compensation, would involve less hardship on them than would regulation by the commission's refusal to approve the operation of their properties as airports because such regulation prevents such use without compensation. Choice of methods for accomplishing its objectives was for the commission. The fact that a less burdensome method than the one chosen might have been adopted to accomplish the objective does not render the one chosen unconstitutional or unreasonable. Sverkerson v. City of Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944, *supra*. We think that the commission's choice is in accord with the legislative policy manifested by the airport zoning provisions of the Aeronautics Code (§§ 360.061 to 360.076), which provide that the prevention of airport hazards (which relators' property would be, so far as Wold-Chamberlain Field is concerned, if licensed as airports) "should be accomplished to the extent legally possible, by exercise of the police power, without compensation." (§ 360.062.)

There have been some questions argued such as whether a regulation adopted by the commission for the separation of airports within the metropolitan area is valid. We do not regard the validity of the regulation as being involved here, because the exercise of the commission's power to approve the operation of airports within the metropolitan area in no way depends upon its validity and because, as has been pointed out, there is support in the record for the commission's refusal to approve.

Our conclusion is that the trial judge erred in reversing the orders of the commission and that the decisions so doing should be reversed with directions to enter orders affirming the orders of the commission.

Reversed with directions to enter orders affirming the orders of the commission.