GEORGE C. COLLIS AND ANOTHER v.
CITY OF BLOOMINGTON.

246 N. W. 2d 19.

August 13, 1976—No. 45523.

*John C. DeMoss,* for appellants.

*Gary Gandrud,* City Attorney, and *Cynthia Hovden Albright,* Assistant City Attorney, for respondent.

*Stanley G. Peskar,* General Counsel, League of Minnesota Municipalities, amicus curiae, seeking affirmance.

KELLY, JUSTICE.

Plaintiffs, George C. Collis and Laurel Collis, appeal from a judgment upholding the constitutionality of a Minnesota statute and Bloomington city ordinance authorizing and mandating dedication of subdivision land to the city for park and recreational purposes or, in lieu of such dedication, payment of fees for those purposes. We affirm.

The trial court decided this case solely on the ground that the statute and ordinance were not unconstitutional on their face.

Plaintiffs' amended complaint alleged no further issue, and neither party challenges the trial court's view of the case in this court. Therefore, we will consider only the facial constitutionality of the provisions at issue and will leave the reasonableness of their application to plaintiffs' property to further proceedings.

The background facts appear to be undisputed: Plaintiffs own approximately 14 acres of land in the city of Bloomington near Interstate Highway No. 35W and the Minnesota River. On May 10, 1972, they applied to the city for approval to subdivide the property into single-family lots. A preliminary plat showing 33 lots was approved by the city council with the condition that a cash park donation to the city would be required at the time of final plat approval. On November 20, 1972, the council gave final plat approval to 5 of the 33 lots and set the park donation for those lots at $2,800, which plaintiffs paid. On October 9, 1973, the council gave final approval to the remaining 28 lots, setting the park donation at $16,400.

On January 25, 1973, plaintiffs commenced this action challenging the facial constitutionality of Minn. St. 1971, § 462.358, subd. 2, and Bloomington City Code, § 20.09 II B, adopted in 1972, which authorize park dedications. Minn. St. 1971, § 462.358 provides in part:

"Subdivision 1. To provide for orderly, economic, and safe development of land and urban services and facilities, and to promote the public health, safety, morals and general welfare, a municipality may adopt subdivision regulations which include minimum physical standards and design requirements as to such urban services and facilities, and procedures for plat approval, including a procedure for appeals from actions of the platting authority. Subdivision regulations shall be adopted by ordinance when the governing body is the platting authority * * *. * * *

"Subd. 2. * * * *The subdivision regulations may require that in appropriate plots of subdivisions to be developed for residential uses that a reasonable portion of each proposed subdivision be dedicated to the public for public use as parks and play-*

*grounds, or that the subdivider at his option in subdivisions in excess of 30 acres, contribute an equivalent amount in cash based on the undeveloped land value as defined by the regulations, provided that cash payments received under such regulations shall be placed in a special fund by the municipality and used only for the acquisition of land for parks and playgrounds, development of existing park and playground sites, and debt retirement in connection with land previously acquired for parks and playgrounds.* In residential subdivisions of less than 30 acres, the subdivision regulations may provide that the subdivider, at the municipality's option, in lieu of the dedication of land for public use, contribute an equivalent amount in cash based on the undeveloped land value as defined by the regulations, for use as above provided. The subdivision regulations, in setting forth the reasonable portion of each proposed subdivision to be dedicated to the public for public use as provided above, may take into consideration the open space, park, recreational or common areas and facilities which the subdivider has provided for the exclusive use of the residents of the subdivision." (Italics supplied.) [1]

Bloomington City Code, § 20.09 II B, prior to amendment subsequent to the commencement of this action, provided in relevant part:

*"Park Donation. It is hereby found and declared that, as a general rule, it is reasonable to require an amount of land equal in value to ten percent of the undeveloped land proposed to be subdivided, be dedicated or reserved to the public for public use for parks and playgrounds. As an alternative, the subdivider may*

---

[1] Minn. St. 1971, 462.358, subd. 2, and Bloomington City Code § 20.09 II B, were amended subsequent to the commencement of plaintiffs' action to include dedication "for public use as parks, playgrounds, *public open space, or storm water holding areas or ponds.*" (Italics supplied.) We note that the city of Bloomington is not attempting to invoke the holding pond portion of the amended ordinance.

*contribute an amount in cash equivalent to the value of land required to be dedicated by this subdivision,* except that where the total land involved is less than 30 acres the City shall have the option as to whether cash or land be donated to meet this requirement. The cash payments shall be used only for the acquisition of land for parks and playgrounds or as otherwise provided by statute. *To determine the value of the land to be dedicated the undeveloped land value shall be used.*

1. *Undeveloped Land Value. As used in this section, the term 'undeveloped land value' shall mean the estimate of market value, as calculated by the City Assessor, of the property included in the subdivision as of the date of approval of the final plat."* (Italics supplied.)

The district court upheld the constitutionality of both the statute and the ordinance and ordered judgment for defendant.

The following issues are presented on appeal:

(1) Is Minn. St. 1971, § 462.358, subd. 2, which authorizes a municipality to require dedication of land for parks and playgrounds, or payment of fees to be used therefor, as a condition for subdivision approval, a taking of property without just compensation contrary to the United States and Minnesota Constitutions?

(2) Is Minn. St. 1971, § 462.358, subd. 2, an unconstitutional delegation of legislative powers to municipalities?

(3) Is Bloomington City Code § 20.09 II B, adopted in 1972 and implementing Minn. St. 1971, § 462.358, subd. 2, outside the scope of enabling legislation or a taking of property without just compensation contrary to the United States and Minnesota Constitutions?

■ The statute is challenged as a taking of property without just compensation contrary to the United States Constitution[2]

_____

[2] The Fifth Amendment to the United States Constitution provides in relevant part: "* * * [N]or shall private property be taken for public use without just compensation."

and the Minnesota Constitution.[3] The city's response to this challenge is that the statute is a valid exercise of the police power which comprehends the dedication of recreational space as reasonably related to the health, safety, welfare, and morals of the citizenry. The general rule of taking and the police power is discussed in several excellent law review articles.[4] The specific issue of the application of these principles to subdivision control regulations has been the subject of several recent cases[5] and an excellent law review article.[6]

Early cases upheld subdivision dedications for streets, parks, etc., either on the ground that the subdivider voluntarily agreed to so dedicate his land or on the ground that subdivision recordation was a privilege which could be conditioned on dedication. See, Johnston, *Constitutionality of Subdivision Control Exactions: The Quest for a Rationale*, 52 Cornell L. Q. 871. Obviously, dedication is no less a taking because the property owner is a subdivider who must obtain local approval for his plans. In the case of Pioneer Trust & Sav. Bank v. Village of Mount Prospect, 22

---

[3] Article 1, § 13, of the Minnesota Constitution provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

[4] See, e. g., Dunham, *Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropriation Law*, 1962 S. Ct. Rev. 63; Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165; Sax, *Takings, Private Property and Public Rights*, 81 Yale L. J. 149; Sax, *Takings and the Police Power*, 74 Yale L. J. 36.

[5] See, Annotation, 43 A. L. R. 3d 862.

[6] Johnston, *Constitutionality of Subdivision Control Exactions: The Quest for a Rationale*, 52 Cornell L. Q. 871. See, generally, Heyman and Gilhool, *The Constitutionality of Imposing Increased Community Costs on New Suburban Residents Through Subdivision Exactions*, 73 Yale L. J. 1119; Reps and Smith, *Control of Urban Land Subdivision*, 14 Syracuse L. Rev. 405; Cunningham, *Public Control of Land Subdivision in Michigan: Description and Critique*, 66 Mich. L. Rev. 1; Taylor, *Current Problems in California Subdivision Control*, 13 Hastings L. J. 344; Comment, 1961 Wis. L. Rev. 310.

Ill. 2d 375, 176 N. E. 2d 799 (1961), the Illinois Supreme Court made a substantial contribution to police power analysis. At issue in Pioneer Trust was the validity of a required dedication of land for a school. The Illinois court articulated the following test for distinguishing takings and valid exercise of the police power in subdivision dedications:

"* * * If the requirement is within the statutory grant of power to the municipality and if the burden cast upon the subdivider is *specifically and uniquely attributable to his activity*, then the requirement is permissible; if not, it is forbidden and amounts to a confiscation of private property in contravention of the constitutional prohibitions rather than reasonable regulation under the police power." (Italics supplied.) 22 Ill. 2d 380, 176 N. E. 2d 802.

The court applied this "specifically and uniquely attributable" test to invalidate the school dedication:

"However, this record does not establish the need for recreational and educational facilities in the event that said subdivision plat is permitted to be filed, is one that is specifically and uniquely attributable to the addition of the subdivision and which should be cast upon the subdivider as his sole financial burden. The agreed statements of facts shows that the present school facilities of Mount Prospect are near capacity. This is the result of the total development of the community. If this whole community had not developed to such an extent or if the existing school facilities were greater, the purported need supposedly would not be present. Therefore, on the record in this case the school problem which allegedly exists here is one which the subdivider should not be obliged to pay the total cost of remedying, and to so construe the statute would amount to an exercise of the power of eminent domain without compensation." 22 Ill. 2d 381, 176 N. E. 2d 802.

The "specifically and uniquely attributable" test was cited and apparently approved by the Montana Supreme Court in Billings

Properties, Inc. v. Yellowstone County, 144 Mont. 25, 394 P. 2d 182 (1964), but was distinguished on the ground that the legislature had determined by statute in Montana that subdivisions of a certain size needed parks. 144 Mont. 35, 394 P. 2d 188. This obvious deference to the legislature is inconsistent with the process of scrutiny of subdivision dedication contemplated in Pioneer Trust.

In 1965 the Wisconsin Supreme Court considered Pioneer Trust in connection with a $200-per-residential-lot dedication requirement for school, park, and recreational needs. Jordan v. Village of Menomonee Falls, 28 Wis. 2d 608, 137 N. W. 2d 442 (1965), appeal dismissed, 385 U. S. 4, 87 S. Ct. 36, 17 L. ed. 2d 3 (1966). After stating the "specifically and uniquely attributable" test, the court adopted the following refinement, which we approve:

"We deem this [the "specifically and uniquely attributable" test] to be an acceptable statement of the yardstick to be applied, provided the words 'specifically and uniquely attributable to his activity' are not so restrictively applied as to cast an unreasonable burden of proof upon the municipality which has enacted the ordinance under attack. In most instances it would be impossible for the municipality to prove that the land required to be dedicated for a park or school site was to meet a need solely attributable to the anticipated influx of people into the community to occupy this particular subdivision. On the other hand, a municipality might well be able to establish that a group of subdivisions approved over a period of several years had been responsible for bringing into the community a considerable number of people making it necessary that the land dedications required of subdividers be utilized for school, park, and recreational purposes for the benefit of such influx. In the absence of contravening evidence this would establish a reasonable basis for finding that the need for the acquisition was occasioned by the activity of the subdivider. Possible contravening evidence would be a showing that the municipality prior to the opening up of the sub-

divisions, acquired sufficient lands for school, park, and recreational purposes to provide for future anticipated needs including such influx, or that the normal growth of the municipality would have made necessary the acquisition irrespective of the influx caused by opening up of subdivisions.

"There also may be situations, unlike the instant one, where there is no substantial influx from the outside and the proposed subdivision only fulfills a purely local need within the community. In those situations it may be more difficult to adduce proof sufficient to sustain a land-dedication requirement.

"We conclude that a required dedication of land for school, park, or recreational sites as a condition for approval of the subdivision plat should be upheld as a valid exercise of police power *if the evidence reasonably establishes that the municipality will be required to provide more land for schools, parks, and playgrounds as a result of approval of the subdivision.*" (Italics supplied.) 28 Wis. 2d 617, 137 N. W. 2d 447.

The court also noted the benefits of platting accruing to the landowner as a basis for dedication:

"The test of reasonableness is always applicable to any attempt to exercise the police power. The basis for upholding a compulsory land-dedication requirement in a platting ordinance in the nature of the instant ordinance is this: The municipality by approval of a proposed subdivision plat enables the subdivider to profit financially by selling the subdivision lots as home-building sites and thus realizing a greater price than could have been obtained if he had sold his property as unplatted lands. In return for this benefit the municipality may require him to dedicate part of his platted land to meet a demand to which the municipality would not have been put but for the influx of people into the community to occupy the subdivision lots." 28 Wis. 2d 619, 137 N. W. 2d 448.

The Jordan case was followed by a series of major cases upholding various subdivision dedication requirements: Jenad, Inc.

v. Village of Scarsdale, 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966) ; Aunt Hack Ridge Estates, Inc. v. Planning Comm. of City of Danbury, 160 Conn. 109, 273 A. 2d 880 (1970) ; Associated Home Builders of the Greater East Bay, Inc. v. City of Walnut Creek, 4 Cal. 3d 633, 94 Cal. Rptr. 630, 484 P. 2d 606, appeal dismissed, 404 U. S. 878, 92 S. Ct. 202, 30 L. ed. 2d 159 (1971). The California statute involved in Associated Home Builders provided for dedication of land or payment of a fee but carefully provided that the amount and location of dedicated land or the amount of fees must "bear a reasonable relationship to the use of the park and recreational facilities by the future inhabitants of the subdivision." 4 Cal. 3d 636, 94 Cal. Rptr. 633, 484 P. 2d 609. The California court declined to offer an opinion as to whether such a relationship was constitutionally required, but relied on what it termed "urgent needs caused by present and anticipated future population growth on the one hand and the disappearance of open land on the other" to uphold the statutory scheme regardless of the absence of a requirement that "the particular subdivider upon whom an exaction has been imposed will, solely by the development of his subdivision, increase the need for recreational facilities to such an extent that additional land for such facilities will be required." 4 Cal. 3d 640, 94 Cal. Rptr. 635, 484 P. 2d 611.

The Minnesota dedication scheme at issue in this case, Minn. St. 1971, § 462.358, subd. 2, contains three important elements: (1) Dedication of a "reasonable portion" of the subdivision for the purposes stated; (2) contribution of an equivalent amount in cash, in lieu of land, based on the fair market value of undeveloped land as defined in municipal subdivision regulations; and (3) placement of the cash amounts collected into a fund to be used only for the purposes stated. The cases discussed above have variously upheld statutory schemes involving these three elements.[7] Furthermore, the use of the term "reasonable por-

---

[7] See, especially, Jenad, Inc. v. Village of Scarsdale, 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966), for a land-fees scheme similar to the one at issue here.

tion" allows this court in interpreting the statute to apply whatever constitutional test it deems appropriate, i. e., the Illinois "specifically and uniquely attributable" test, the Wisconsin modification of that test, or some other test.

In his excellent and comprehensive article on the subject of the constitutionality of subdivision dedication requirements, Professor John D. Johnston, Jr., succinctly distinguishes subdivision control from other taking problems:

"Virtually every subdivision control dispute presents issues concerning the constitutionality and interpretation of the enabling act, the validity of the implementing ordinance, and the question whether a given regulation constitutes so severe a burden as to be unreasonable as applied to a particular subdivider. These issues are closely interrelated. Each involves judgments about the proper scope of the police power and the ambit of freedom from official regulation that is implicit in the concept of private property.

"The effect of the constitutional guarantee that private property not be taken for public use except upon payment of just compensation adds to the confusion. Clearly, the nonsubdivider is entitled to compensation for his land when it is converted to street, park, or other public use. Why should the subdivider be excluded from this guarantee? As implied by the excise-tax rationale of [Jordan v. Village of Menomonee Falls, 28 Wis. 2d 608, 137 N. W. 2d 442 (1965)] there is an elementary but vital distinction between developers and other landowners. *The subdivider is a manufacturer, processer, and marketer of a product; land is but one of his raw materials. In subdivision control disputes, the developer is not defending hearth and home against the king's intrusion, but simply attempting to maximize his profits from the sale of a finished product. As applied to him, subdivision control exactions are actually business regulations.*

"In a very real sense, all subdivision control exactions are grounded upon a judgment that subdivisions which do not provide adequate space for streets, utilities, parks, and other public

uses are defective. Although the consumer may be able to discern the existence of such defects, his bargaining power is probably too weak to force subdividers to provide necessary improvements. From the municipality's point of view, the danger from a defective subdivision is actually greater than the threat posed by defectively manufactured automobiles, refrigerators, or other durable goods. The subdivision remains, long after the automobiles have been relegated to the junk heap, to spawn conditions of slum and blight. Further, the removal or rehabilitation of a subdivision may necessitate large expenditures of public funds. The ability of a defective environment to cripple or maim its inhabitants may not be so dramatic and obvious as that of automobiles and other inherently dangerous instrumentalities, but it is no less real." (Italics supplied in part.) *Constitutionality of Subdivision Control Exactions: The Quest for a Rationale*, 52 Cornell L. Q. 871, 922.

As to the various cases, Professor Johnston concludes:

"*Jordan v. Village of Menomonee Falls* offers the most consistent, workable rationale for the accommodation of these interests within the traditional police-power analysis. But *Jordan*, unlike [Billings Properties, Inc. v. Yellowstone County, 144 Mont. 25, 394 P. 2d 182 (1964)] and [Jenad, Inc. v. Village of Scarsdale, 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966)], charts a difficult course for municipal officials. The burden of establishing a rational nexus between their exactions and the public needs attributable to subdivision development is a substantial one. Standards can be developed and supported only after considerable data have been gathered and carefully analyzed. It may be impossible to determine to everyone's satisfaction the precise point at which sufficient subdivision improvements are furnished to prevent the development from being 'substandard.' But if we accept similar uncertainties in zoning and building-code enforcement, we should be equally willing to do so in subdivision control mat-

ters—provided, of course, that state and local officials allocate sufficient resources to accomplish the formulation of defensible subdivision standards." 52 Cornell L. Q. 924.[8]

While in general subdivision regulations are a valid exercise of the police power, made necessary by the problems subdivisions create—i. e., greater needs for municipal services and facilities—, the possibility of arbitrariness and unfairness in their application is nonetheless substantial: A municipality could use dedication regulations to exact land or fees from a subdivider far out of proportion to the needs created by his subdivision in order to avoid imposing the burden of paying for additional services on all citizens via taxation. To tolerate this situation would be to allow an otherwise acceptable exercise of police power to become grand theft. But the enabling statute here prevents this from occurring by authorizing dedication of only a "reasonable portion" of land for the purposes stated. We therefore uphold the statute as constitutional. A "reasonable portion" is construed to mean that portion of land which the evidence reasonably establishes the municipality will need to acquire for the

---

[8] In a similar vein, Professor Joseph L. Sax has argued that uses of property which cause spillover effects on other property may be subject to valid exercise of the police power: "Notice that this takings doctrine is tied to an assumption that the right to compensation, and the amount to be paid, can be determined by examining the economic effects that occur solely within the physical boundaries of one's property. Surely it is naive, however, to suppose that one who profits from a piece of property necessarily uses only those resources within his boundaries, and equally naive to think the consequences of one property user's activities are confined to his property. Property does not exist in isolation. Particular parcels are tied to one another in complex ways, and property is more accurately described as being inextricably part of a network of relationships that is neither limited to, nor usefully defined by, the property boundaries with which the legal system is accustomed to dealing. Frequently, use of any given parcel of property is at the same time effectively a use of, or a demand upon, property beyond the border of the user." *Takings, Private Property and Public Rights,* 81 Yale L. J. 149, 152.

purposes stated as a result of approval of the subdivision. This is, of necessity, a facts-and-circumstances test, but it is the only kind of test that will consider the myriad of factors which may bear on a municipality's needs for certain kinds of facilities and the relationship of a particular subdivision to those needs.

In articulating this test, we decline to follow the extreme approaches of the Illinois and Montana cases discussed herein. We choose instead to follow the lead of Wisconsin, California, and New York, and those cases which hold that a reasonable relationship between the approval of the subdivision and the municipality's need for land is required.

■ The issue of delegation of authority to municipalities and their officials to regulate subdivisions is raised by the parties. The subdivision-control statute in this case imports a standard of reasonableness and otherwise clearly specifies the type of regulation authorized and the standards to which such a regulation must conform. This is all that Minnesota case law requires. O'Brien v. City of St. Paul, 285 Minn. 378, 173 N. W. 2d 462 (1969); Lee v. Delmont, 228 Minn. 101, 36 N. W. 2d 530 (1949); State ex rel. Interstate Air-Parts, Inc. v. M. A. C. 223 Minn. 175, 25 N. W. 2d 718 (1947).

■ Three aspects of the Bloomington ordinance present further problems: (1) The requirement that 10 percent of the undeveloped land must be dedicated or its cash equivalent paid; (2) the definition of undeveloped land value as the estimate of market value made by the city assessor; and (3) the use of the date of approval of the final plat as the date upon which undeveloped land value is determined. Since none of these aspects of the ordinance is mandated by the enabling statute, we might choose to hold that any or all of them is beyond the authority given by that statute. For the reasons that follow, however, we find such a holding unnecessary.

Requirements based on portions of the plat and ratios of the plat to acres have been upheld in the cases discussed *supra*. Billings Properties, Inc. v. Yellowstone County, *supra* (1/9 to 1/12

of the plat) ; Associated Home Builders of the Greater East Bay, Inc. v. City of Walnut Creek, *supra* (2 1/2 acres of park or recreation land for each 1,000 new residents) ; Jenad, Inc. v. Village of Scarsdale, *supra* ($250 per lot) ; Jordan v. Village of Menomonee Falls, *supra* ($200 per lot). One case has held that a 7-percent requirement was arbitrary as a matter of law, using the "specifically and uniquely attributable" test. Ansuini v. City of Cranston, 107 R. I. 63, 264 A. 2d 910 (1970).

Two commentators have made the following statement regarding flat percentage of land requirements in school dedication cases :

"* * * A requirement such as land dedication, for schools, however, poses a more difficult problem. To avoid discrimination all developers should be required to make dedications for this purpose according to criteria which will result in equal treatment. But it is normally impossible to demand such dedications from small developers whose subdivisions will not conceivably generate the need for an entire school and whose locations often will be quite inconvenient for such a facility. Moreover, it is extremely difficult to establish criteria for land dedications which result in equal treatment. A number of contemporary ordinances seek a specific percentage of the development's total area. When such a standard applies across the board there is no showing that resultant acreage is at all related to the school needs generated by the subdivisions. As noted, the criterion which determines the extent of the exaction in the case of interior streets is need: each subdivision is 'automatically required to provide interior streets necessary to handle the traffic generated by it.' There is no necessary relationship, however, between the total acreage of the development and the school needs which will be generated by it. A development with numerous homes on small lots will impose a much greater educational burden than a development with fewer homes on larger lots. Thus a percentage of total acreage is not necessarily a rational measure (or classifying principle) to determine the extent of the dedication exaction. Indeed, this

lack of necessary relationship was one of the problems perceived in [Pioneer Trust & Sav. Bank v. Village of Mount Prospect, 22 Ill. 2d 375, 176 N. E. 2d 799 (1961)]." Heyman and Gilhool, *The Constitutionality of Imposing Increased Community Costs on New Suburban Residents Through Subdivision Exactions,* 73 Yale L. J. 1119, 1142.

The same line of reasoning can be applied to parks and recreation. Subdivisions with lots of different sizes may bring in different numbers of people. A high-rise building or small-lot development might create a greater need for parks and recreational space than a large-lot development. See, Associated Home Builders of the Greater East Bay, Inc. v. City of Walnut Creek, *supra.* Yet, in the city of Bloomington all are treated the same—each developer must pay 10 percent of undeveloped land value or contribute 10 percent of his property. Thus, there exists the possibility that the developer (and ultimately the subdivision's homeowners) will be forced to pay a disproportionate share of the city's park and recreational costs. While the city has apparently made a record in this case showing that 10 percent is not unreasonable as to the property of these plaintiffs, given the particular needs of Bloomington, a 10-percent requirement might be arbitrary as a matter of law because it does not consider the relationship between this particular subdivision and recreational need in the community as required by the Pioneer Trust and Jordan cases.

In view of the language of the Bloomington ordinance, however, such a holding would be premature. On its face, the ordinance says only that "as a general rule, it is reasonable to require" dedication of 10 percent of the land or payment of 10 percent of undeveloped land value. Certainly a developer may rebut this statement in a judicial review proceeding under Minn. St. 462.361 in which all of the facts and the developer's constitutional claims may be fully developed. So construed, the statement in the ordinance regarding a 10-percent dedication or donation does not render the ordinance unconstitutional.

As the trial court correctly observed, the city cannot foreclose review of the question of undeveloped land value by making its assessor's decision final. This would be far in excess of the authority granted in the enabling act and would violate due process as well. The trial court held, and we also hold, that the city assessor's determination is likewise only prima facie evidence of undeveloped land value which may be attacked in a § 462.361 judicial review proceeding.

Plaintiffs argue that the ordinance, by providing that the city assessor is to value their land as of the date of final plat approval rather than before platting and planning has begun, is using *developed* land value. The enabling statute does not define the term undeveloped land value, but allows the municipality to do so by regulation. The city argues that land is not developed until it is put to use or buildings are erected and that any other definition could even hurt developers and provide an inaccurate reflection of actual park needs. The city's position seems meritorious. The ideal point to evaluate the land for recreational purposes and the other purposes stated in the statutes is when the nature of the subdivision, its probable population, lot size, and other relevant factors can be reasonably known. Under the facts here, the city's use of the date of final plat approval is a reasonable exercise of its power to define "undeveloped land value."

We uphold the enabling statute and the Bloomington ordinance as constitutional. We do so without prejudice to plaintiffs' rights to attack the constitutionality of these measures as applied to plaintiffs' property in judicial review proceedings.

Affirmed.