STATE OF MINNESOTA

IN SUPREME COURT

A21-0895

Court of Appeals                                                    Hudson, J.
                          Concurring in part, dissenting in part, Anderson, J.,
                                                                  Gildea, C.J.

Almir Puce,

              Respondent,

vs.                                                  Filed:  September 28, 2023
                                                    Office of Appellate Courts
City of Burnsville, MN.,

              Appellant.

_____

Stephen W. Cooper, Stacey R. Everson, The Cooper Law Firm, Chartered, Minneapolis, Minnesota, for respondent.

Paul D. Reuvers, Jason J. Kuboushek, Andrew A. Wolf, Iverson Reuvers, Bloomington, Minnesota, for appellant.

Patricia Y. Beety, Susan L. Naughton, Saint Paul, Minnesota, for amicus curiae League of Minnesota Cities.

Rob A. Stefonowicz, Bryan J. Huntington, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, for amicus curiae Housing First Minnesota.

_____

S Y L L A B U S

1.      Minnesota Statutes section 462.358, subdivision 2c(a) (2022), is a codification by the Legislature of the "essential nexus" and "rough proportionality"

1

standards from the Supreme Court's decisions in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

2.     The city's park dedication fee has an "essential nexus," as required by Minnesota Statutes section 462.358, subdivision 2c(a) (2022), because there is some logical connection between the imposed park dedication fee and the municipal purpose sought to be achieved by the fee, and has a "rough proportionality" as required by the same statute, because the city made an individualized determination that the fee is related to the impact of the proposed development.

3.     The city complied with Minnesota Statutes section 462.358, subdivision 2b(e) (2022) because the city made a reasonable determination that it would need 5 percent of the gross land area of the development to maintain open space in proportion to city projections.

Reversed and remanded.

O P I N I O N

HUDSON, Justice.

This case requires us to determine whether the imposition of a park dedication fee by appellant City of Burnsville (the City) on respondent Almir Puce's development application is lawful under Minnesota Statutes section 462.358 (2022), which governs subdivision regulation and dedication.  Puce sought preliminary and final approval from the Burnsville City Council to develop a parcel of land for various commercial uses.  The city council approved Puce's development plans but imposed an $11,700 park dedication fee.  Puce appealed the imposition of the fee to the district court, which found the

2

imposition of the fee lawful. Puce then appealed to the court of appeals, which reversed, determining that the park dedication fee was unlawful under Minnesota Statutes section 462.358, subdivision 2c(a), because there was not a rough proportionality between the imposed fee and the need created by Puce's proposed development. Further, the court of appeals determined that the City failed to reasonably determine that it would require 5 percent of Puce's development as a result of the approval of his development under Minnesota Statutes section 462.358, subdivision 2b(e). We now reverse and remand.

## FACTS[1]

The City of Burnsville is a statutory city.[2] A statutory city has no inherent powers beyond those expressly conferred by statute or implied as necessary in aid of those powers that have been expressly conferred. *Harstad v. City of Woodbury*, 916 N.W.2d 540, 545 (Minn. 2018). Pursuant to state law, municipalities "may by ordinance adopt subdivision

---

[1] The City raised two justiciability issues in its briefing before this court. The City withdrew both arguments at oral argument. First, the City argued in its briefs that it was not properly served. But at oral argument, the City assured us that subsequent investigation determined that it had been properly served. Second, the City asserted in its brief that the approval of Puce's application had become moot and void under a city ordinance that requires applicants to record their approved plats. But at oral argument it urged us to nonetheless reach the merits of this case. We take this opportunity to remind parties to promptly notify the court and opposing counsel if their arguments have changed prior to oral argument to allow adequate time to prepare for, or respond to, a changed position. "[T]he existence of a justiciable controversy is essential to this court's exercise of jurisdiction." *Izaak Walton League of Am. Endowment, Inc. v. State, Dep't of Nat. Res.*, 252 N.W.2d 852, 854 (Minn. 1977). Because it appears that the jurisdictional issue is resolved, and because we have not been presented with adequate evidence that this case is moot, we reach the merits.

[2] "The term 'statutory city' means any city which has not adopted a home rule charter pursuant to the constitution and laws." Minn. Stat. § 410.015 (2022).

regulations establishing standards, requirements, and procedures for the review and approval or disapproval of subdivisions." Minn. Stat. § 462.358, subd. 1a. Further, state law allows municipalities to enact ordinances that provide for the dedication to the public of a "reasonable portion" of any proposed subdivision or preservation for public use. Minn. Stat. § 462.358, subd. 2b(a). A municipality may elect to accept a cash fee in lieu of a land dedication:

> The municipality may choose to accept a cash fee as set by ordinance from the applicant for some or all of the new lots created in the subdivision, based on the average fair market value of the unplatted land for which park fees have not already been paid that is, no later than at the time of final approval or under the city's adopted comprehensive plan, to be served by municipal sanitary sewer and water service or community septic and private well as authorized by state law. For purposes of redevelopment on developed land, the municipality may choose to accept a cash fee based on fair market value of the land no later than the time of final approval. "Fair market value" means the value of the land as determined by the municipality annually based on tax valuation or other relevant data. If the municipality's calculation of valuation is objected to by the applicant, then the value shall be as negotiated between the municipality and the applicant, or based on the market value as determined by the municipality based on an independent appraisal of land in a same or similar land use category.

Minn. Stat. § 462.358, subd. 2b(c).

The City has an ordinance that requires all developers who are platting or replatting land to contribute a park dedication or an equivalent fee. It provides in part:

> Public Uses: Pursuant to Minnesota statutes, section 462.358, subdivision 2a, the city council shall require all developers requesting platting or replatting, or the development of unplatted land in the city to contribute lands, in the amounts listed below, to be dedicated to the public for their use as either parks, playground, public open space, trail systems, water ponding, public lands or to contribute an equivalent amount of cash, based upon the conditions outlined below. The form of contribution (cash or land, or any combination thereof) shall be decided by the city council based upon need and conformance with approved city plans.

4

Burnsville, Minn., Code § 11-4-8.A (2022). The city code also provides a "dedication formula" for calculating the amount of land to be dedicated, or in the alternative, the park dedication fee for commercial and industrial developments:

> The dedication formula for commercial and industrial district development shall be five percent (5%) of the gross land area. Where the city council elects to take cash in lieu of land, such contribution shall be based upon land dedication requirement multiplied by the average cost per acre by zoning district as established, from time to time, by the city council.

Burnsville, Minn., Code § 11-4-8.E (2022).[3]

In 2000, BWP Company subdivided property that it owned in Burnsville, creating two new parcels of land. BWP Company platted and paid a park dedication fee of $10,070 on the northern parcel at that time. BWP Company and the City agreed to defer payment on the southern parcel until it was platted and developed. In 2015, Puce purchased the southern parcel. The parcel is undeveloped and zoned for commercial use, but it has a legal non-conforming single-family home, where Puce lived until 2017.

In 2018, Puce began the application process with the City to develop his parcel for commercial use. He planned to develop the parcel in two to three phases: phase one involved an auto dealership and bakery/coffee shop, phase two involved an auto repair shop, and a potential phase three involved an outdoor storage facility. Puce sought approval of a preliminary and final plat of the property, a conditional use permit, and

---

[3]5    The City has a separate formula for calculating the dedication or dedication fee for residential developments. Burnsville, Minn., Code § 11-4-8.E ("The dedication formula for residential land shall be based on the national standard of providing ten (10) acres of parks and open spaces per one thousand (1,000) population and residential subdivisions shall be computed on the proposed number of dwelling units in a project and the average population for dwelling unit type as established by the metropolitan council.").

variances related to sloping of the property and signage. Puce objected to any imposition of a park dedication fee, arguing that "no need whatsoever will be created for parks by this proposed development."

The city planning commission recommended that the city council approve the preliminary and final plats, subject to several conditions. It also recommended that Puce be required to pay a park dedication fee of $37,804.[4] At a city council meeting in January 2019, Puce, represented by counsel, argued against the imposition of a park dedication fee, stating that "there is nothing this particular project is going to do to increase the need for parks." He further argued that a park dedication fee is proper only when there is a "direct link [that] the subdivision is the cause of needing more parks." The City countered that "[t]here's a need for open space created any time that open land is developed or redeveloped and used at a higher intensity than previously used." The matter was continued for further consideration.

The City later recalculated and reduced the fee to $11,700. The City typically uses average commercial property values to calculate park dedication fees, but because Puce's land value is less than the commercial property average, it found that a fee reduction was reasonable. *See* Burnsville, Minn., Code § 11-4-8.E. The City stated that the reduced

---

[4]     As the court of appeals noted, "[o]rdinarily, a park-dedication fee is owed only when property is subdivided." *Puce v. City of Burnsville*, 971 N.W.2d 285, 289 n.1 (Minn. App. 2022) (citing Minn. Stat. § 462.358, subd. 2b(a), (i)). It was uncertain whether Puce's requested property development constituted a "subdivision" under this provision. *See* Minn. Stat. § 462.358. The court of appeals resolved this issue in a footnote, suggesting that Puce's parcel was created by subdivision in 2000, and noting that BWP Company and the City agreed to defer payment of a park dedication fee on the southern parcel *until it was developed*. *Puce*, 971 N.W.2d at 289 n.1. The parties did not seek review of this issue.

6

amount reflects the scope of the development, the needs of the City, and the requirements of its ordinances.[5]

The park dedication fee was discussed again at a subsequent city council meeting. Puce requested a waiver of the reduced park dedication fee. When asked by a councilmember where a new park would be designated, the city attorney conceded that although there is a city capital improvement plan, there was no planned "actual land acquisition" at the time. The city attorney, however, pointed out that the addition of "a substantial amount of building structure, 7,254 additional square feet, and a substantial amount of impervious surface parking lot area" would eliminate much of the green space of the property, and the City's park dedication formula was intended to "reserve green space and park land and have amenities available." The city attorney stated that although the park dedication funds cannot be used for maintenance,[6] the City was seeking to expand and fix a gap in its regional trail system near the proposed development. He went on to note that "many residents" could use these trails, including users of Puce's development. Puce argued that the City's proposed expansion was not a permissible use of the park dedication fee as these trail plans existed before Puce's proposed development.

---

[5]    The City's calculation was: "FORMULA: 1.8 Acres X 0.05 Acres/Acres X $130,000/Acre = $11,700."

[6]    *See* Minn. Stat. § 462.358, subd. 2b(g) ("Cash payments received must be used only for the acquisition and development or improvement of parks, recreational facilities, playgrounds, trails, wetlands, or open space based on the approved park systems plan. Cash payments must not be used for ongoing operation or maintenance of parks, recreational facilities, playgrounds, trails, wetlands, or open space.").

7

The city council approved Puce's plat and conditional use permit on March 5, 2019, and imposed the $11,700 park dedication fee. Puce appealed the imposition of a park dedication fee to the district court pursuant to Minnesota Statutes section 462.361, subdivision 1 (2022). The district court held a court trial and found that the park dedication fee was lawful. The court found that there was an essential nexus between the fee imposed and the City's purpose of imposing the fee, namely that the City planned to build a trail next to the property and Puce's development would draw more traffic to nearby parks and trails.

Puce appealed to the court of appeals. He raised several arguments, but the court of appeals considered only whether the imposition of the $11,700 park dedication fee violated Minnesota Statutes section 462.358, subdivisions 2b(e) and 2c(a). *Puce v. City of Burnsville*, 971 N.W.2d 285, 292–93 (Minn. App. 2022). The court of appeals reversed the district court, determining that the City's imposition of a park dedication fee on Puce's application violated subdivisions 2b(e) and 2c(a). Subdivision 2b(e) provides that "[t]he municipality must reasonably determine that it will need to acquire that portion of land for the purposes stated in this subdivision as a result of approval of the subdivision." Minn. Stat. § 462.358, subd. 2b(e). The court of appeals explained that the City violated subdivision 2b(e) because its decision to impose a park dedication fee did not have a sufficient legal or factual basis. *Puce*, 971 N.W.2d at 294. The court of appeals also determined that the City violated subdivision 2c(a) of section 462.358 because, although there was an "essential nexus" between the fee and the City's purpose of imposing it, there was no "rough proportionality" between the park dedication fee and "the need created by

8

the proposed subdivision or development." *Puce*, 971 N.W.2d at 296–97; *see* Minn. Stat. § 462.358, subd. 2c(a).

We granted the City's petition for review.

**ANALYSIS**

The City argues that its imposition of a park dedication fee on Puce's development application was lawful under the "essential nexus" and "rough proportionality" requirements in Minnesota Statutes section 462.358, subdivision 2c(a), as well as the "reasonabl[e] determin[ation]" requirement in subdivision 2b(e). Puce contends that the City's use of a percentage-based formula to calculate the fee failed to consider the need, if any, created by his development, and that the court of appeals correctly determined that the imposition of the fee was unlawful under both subdivisions 2b(e) and 2c(a). Before analyzing those statutory provisions, however, it is helpful to first summarize our precedent on park dedication fees under section 462.358 to capture the evolution of the statute.

In 1976, we considered a facial challenge to the constitutionality of the then-effective version of Minnesota Statutes section 462.358 in *Collis v. City of Bloomington*, 246 N.W.2d 19 (Minn. 1976). Specifically, we addressed what test should apply when determining whether a park dedication fee is constitutional. *Id.* at 21–22. In upholding the constitutionality of section 462.358, we determined that because only a "reasonable portion" of land could be dedicated for the stated purposes, section 462.358 constrained municipalities from abusing their police power. *Id.* at 26. We construed the statutory phrase "reasonable portion" to mean "that portion of land which the evidence reasonably establishes the municipality will need to acquire for the purposes stated as a

9

result of approval of the subdivision*." Id.* Although this resulted in a "facts-and-circumstances test," we deemed it necessary to "consider the myriad of factors which may bear on a municipality's needs for certain kinds of facilities and the relationship of a particular subdivision to those needs." *Id.*

Although we sought to avoid overly stringent standards for municipalities' regulations, we also cautioned against arbitrary regulations which could create "substantial" risks to property owners. *Id.* We recognized that this valid exercise of municipalities' police power could become "grand theft" if municipalities used it to impose fees out of proportion to the needs created by a development, forcing individual developers to shoulder burdens that should be shared among all citizens through taxation. *Id.*

We noted that a percentage requirement could be problematic because "it does not consider the relationship between [a] particular subdivision and recreational need in the community," but declined to decide the issue. *Id.* at 27. The specific ordinance at issue in *Collis* required a 10 percent dedication fee. *Id.* We concluded, however, that an ordinance requiring a 10 percent dedication fee could be considered reasonable. *Id.* We observed that if developers disputed whether the figure was arbitrary as applied to their subdivision, they could appeal the fee under Minnesota Statutes section 462.361. *Id.* *Collis* therefore upheld the constitutionality of percentage-based dedication formulas.

Since *Collis* was decided, the Legislature has amended section 462.358 several times. Minnesota Statutes section 462.358, subdivision 2b(a) (2022) allows municipalities to require a "reasonable portion" of buildable land to be dedicated for public use. Language similar to this now-existing subdivision was first added to section 462.358 in 1980, after

we announced our interpretation of a "reasonable portion" in *Collis*. 246 N.W.2d at 26; Act of Apr. 15, 1980, ch. 566, 1980 Minn. Laws 869, 880. We stated that a "reasonable portion" was construed to mean "that portion of land which the evidence reasonably establishes the municipality will need to acquire for the purposes stated as a result of approval of the subdivision." *Collis*, 246 N.W.2d at 26. Subdivision 2b(e) essentially codifies this interpretation, providing that "[t]he municipality must reasonably determine that it will need to acquire that portion of land for the purposes stated in this subdivision as a result of approval of the subdivision." Minn. Stat. § 462.358, subd. 2b(e).

As for subdivision 2c, the other subdivision at issue here, it was added by the Legislature in 2004. *See* Act of May 10, 2004, ch. 178, 2004 Minn. Laws 241, 243. Subdivision 2c(a) provides:

> There must be an essential nexus between the fees or dedication imposed under subdivision 2b and the municipal purpose sought to be achieved by the fee or dedication. The fee or dedication must bear a rough proportionality to the need created by the proposed subdivision or development.

Minn. Stat. § 462.358, subd. 2c(a).

It is against this backdrop that the City argues that the court of appeals erred. First, the City argues that the court of appeals erred when it determined the City's imposition of a park dedication fee was unlawful under subdivision 2c(a), particularly because we upheld percentage-based formulas in *Collis*. Second, the City challenges the court of appeals' conclusion that the City's imposition of a park dedication fee violated subdivision 2b(e) and argues that subdivision 2b(e) does not apply to specific fee dedication decisions, but

11

rather sets standards for a municipality's ordinances and regulations. We address each issue in turn.

I.

Whether the City's imposition of a park dedication fee was lawful under Minnesota Statutes section 462.358, subdivision 2c(a) requires us to interpret the statutory phrases "essential nexus" and "rough proportionality."

We review issues of statutory interpretation de novo. *State v. Townsend*, 941 N.W.2d 108, 110 (Minn. 2020). The goal of statutory interpretation is to give effect to the intent of the Legislature. Minn. Stat. § 645.16 (2022). Although words and phrases are typically construed according to their ordinary meaning, "technical words and phrases and such others as have acquired a special meaning . . . are construed according to such special meaning." Minn. Stat. § 645.08(1) (2022). Whether to find a technical or special meaning of a phrase depends in part on the context in which it appears. *State v. Rick*, 835 N.W.2d 478, 484 (Minn. 2013).

Here, the context in which "essential nexus" and "rough proportionality" are used is important for determining whether they have specialized meanings. *See Thompson v. St. Anthony Leased Hous. Assocs. II, LP*, 979 N.W.2d 1, 8 (Minn. 2022). These terms appear in a statute pertaining to municipalities imposing a fee or park dedication upon the creation of a subdivision or development. The United States Supreme Court, for its part, has defined these same terms—"essential nexus" and "rough proportionality"—in the context of federal constitutional takings law as applied to adjudicatory exactions of property in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S.

374 (1994). Monetary exactions must also satisfy the requirements of *Nollan* and *Dolan*. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013). The Supreme Court determined that there must be an "essential nexus" between an imposed condition to a permit approval and the purpose of that condition. *Nollan*, 483 U.S. at 836–37. Essentially, there must be a connection between the legitimate governmental purpose and the imposed condition intended to achieve that purpose. *Id.*

The Supreme Court expounded on its takings analysis in *Dolan*, explaining that once an essential nexus is found, there must be a "connection between the exactions and the projected impact of the proposed development." 512 U.S. at 386. The Court determined that a "rough proportionality" is required, such that a city must engage in "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391. No mathematical calculation is required to meet this standard, but there must be "some effort to quantify its findings in support of the dedication" that is more than a "conclusory statement." *Id.* at 395–96.

Again, the Legislature added subdivision 2c(a), requiring a rough proportionality and essential nexus, to section 462.358 in 2004, after the decisions in *Nollan* and *Dolan*.[7] Thus, subdivision 2c(a) is a codification of the "essential nexus" and "rough

[7] The enactment of subdivision 2c predated the decision in *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), but the Legislature made clear that fees imposed under Minn. Stat. § 462.358, subd. 2b, are subject to the essential nexus and rough proportionality tests through its enactment of subdivision 2c in 2004. Minn. Stat. § 462.358, subd. 2c(a) (requiring an essential nexus and rough proportionality "between *the fees or* dedication" (emphasis added)).

13

proportionality" requirements, indicating the Legislature's intent that those standards from *Nollan* and *Dolan* govern, even when evaluating a park dedication fee imposed pursuant to a generally applicable ordinance.[8]  Municipalities do not have the inherent power to impose a park dedication or fee, *Harstad*, 916 N.W.2d at 545, and when the Legislature granted this power, it provided standards for a municipality's imposition of a park dedication or fee.  In doing so, it chose language that has a specialized meaning in this context.  Interpreting subdivision 2c(a) consistent with *Nollan* and *Dolan* best effectuates the intent of the Legislature.

## II.

Adopting the Supreme Court's interpretations of "essential nexus" and "rough proportionality" for Minnesota Statutes section 462.358, subdivision 2c(a), we now turn to whether the City met these standards.  We typically review a governing body's decision for whether it is "unreasonable, arbitrary or capricious." *Swanson v. City of Bloomington*, 421 N.W.2d 307, 311 (Minn. 1988) (citations omitted) (internal quotation marks omitted).  The reasons given by the city must be both legally sufficient and have a factual basis in the record. *RDNT, LLC v. City of Bloomington*, 861 N.W.2d 71, 75–76 (Minn. 2015).  When the Legislature provides specific requirements that a municipality must abide by, however,

---

[8]     The City argues that *Nollan* and *Dolan* are inapplicable to a legislative fee imposed through a *generally* applicable ordinance.  Instead, the City contends, they apply, as a matter of constitutional law, only to individualized exactions. *See Koontz*, 570 U.S. at 610 (declining to consider "how concrete and specific a demand must be to give rise to liability under *Nollan* and *Dolan*.").  While the Supreme Court has not decided whether *Nollan* and *Dolan* apply to fees resulting from generally applicable regulations as a constitutional matter, the Legislature chose to adopt those standards here.

14

"we cannot ignore the plain language of the statute." *Krummenacher v. City of Minnetonka*, 783 N.W.2d 721, 732 (Minn. 2010).

First, there was an essential nexus as that term is understood in *Nollan* and *Dolan* between the fee and the City's purpose of imposing it. The City imposed the fee to fund the acquisition or improvement of open space and parkland following the development of Puce's property. A connection existed between the fee and the purposes the City sought to achieve, thus, an essential nexus between the two was present. The court of appeals properly determined that the City satisfied the "essential nexus" requirement.

Second, subdivision 2c(a) requires a rough proportionality between the imposed fee and the need created by the proposed development. Minn. Stat. § 462.358, subd. 2c(a). Using the Supreme Court's interpretation of "rough proportionality," the City was required to make an individualized determination that the fee is related both in nature and extent to the impact of the proposed development or subdivision. *See Dolan*, 512 U.S. at 391.

In enacting section 462.358, the Legislature recognized that municipalities have a great interest in maintaining open spaces in their communities when new developments are approved. Further, the Legislature contemplated in section 462.358 that a city had authority to impose a park dedication fee by formula to achieve that end. *See Collis*, 246 N.W.2d at 26–27. Percentage-based formulas—in contrast to determining the proper dedication or fee amount on a case-by-case basis—have the benefits of efficiency and treating all development applications equally rather than arbitrarily. Likewise, they provide developers with predictability of the fees to be assessed on their developments. Indeed, it may be challenging as a practical matter to prove on a case-by-case basis that a

15

single new development (such as the one at issue) will have any demonstrable impact on open space. But a series of single new developments will plainly have such an impact.

The question, then, is how to ensure that a park dedication fee derived from a percentage-based formula that applies to all similar properties is roughly proportional to the nature and extent of the impact that a particular proposed development or subdivision will have on a city's need for green space and parkland. A city can justify its imposition of a percentage-based formula on a particular class of properties if it can show that the revenue to be raised from such a fee is reasonably necessary for the development of parks, playgrounds, trails, wetlands, or open space in response to anticipated commercial development in the city—in other words, that the fee reflects, or is roughly proportional, to the amount necessary to counter the impact of the expected developments. And a municipality may permissibly determine the appropriate percentage at a level of generality higher than each individual property through, for instance, a comprehensive study that accounts for projected population and employment growth, existing and future need for open space, and intensity of use. But critically, that percentage-based fee should then be calculated based on the assessed value of the land that would have been dedicated. *See, e.g.*, *Trimen Dev. Co. v. King County*, 877 P.2d 187, 194 (Wash. 1994) (upholding a county ordinance because the fee in lieu of dedication amount was "calculated based on zoning, projected population, and the assessed value of the land that *would have been dedicated or reserved.*").[9] For example, if a city determines based on its broader analysis that serving

_____

[9] The dissent notes that the statute at issue in *Trimen* did not require a "rough proportionality." Instead, the statute authorized dedications that the municipality could

16

the park and greenspace needs of the community reasonably requires that 5 percent of proposed commercial developments be dedicated to parks and greenspace, and applies the 5 percent figure to the actual assessed value of the gross area of the applicant's proposed subdivision, the municipality's fee would satisfy the individualized determination required by the rough proportionality provision in subdivision 2c(a).[10]

Here, the City first applied its dedication formula found in Burnsville City Code section 11-4-8.E, resulting in a park dedication fee of $37,804. The City justified the 5 percent figure in its ordinance with its 2040 comprehensive plan.[11] Applying the

---

demonstrate are "reasonably necessary as a *direct result of the proposed development*." *Trimen*, 877 P.2d at 192 (citing RCW 82.02.020 (1982)) (emphasis added). The dissent's linguistic quarrel is puzzling because the dissent determines that the City should have evaluated the *impact* of Puce's proposed development—seemingly the precise inquiry of the statute at issue in *Trimen*. Regardless of the respective parties' negotiations, the salient point is that the municipality in *Trimen* likewise did not conduct a site-specific study. *Id.* at 194. The Supreme Court of Washington relied on the municipality's comprehensive assessment of park needs and the projected occupancy of the development. *Id.* The court concluded that relying on an impact assessment was a "reasonable, pro-active approach to the regulation of development." *Id.* Notably, the court cited *Dolan* and the "rough proportionality" requirement to support its holding. *Id.* Here, the direct impact of an industrial or business development will be far more difficult—if not impossible—to project, particularly at preliminary permitting stages. This difficulty is apparent in the City's differing treatment of residential and industrial developments in its ordinances. To rely on a comprehensive assessment in the industrial context, therefore, is likewise a reasonable and proactive approach to assessing expected impact.

[10]    Minnesota Statutes section 462.358, subdivision 2b(c) defines "fair market value," on which park dedication fees are to be based, as, "the value of the land as determined by the municipality annually based on tax valuation or other relevant data. If the municipality's calculation of valuation is objected to by the applicant, then the value shall be as negotiated between the municipality and the applicant, or based on the market value as determined by the municipality based on an independent appraisal of land in a same or similar land use category."

[11]    The reasonableness of the 5 percent figure is discussed below, *infra* III.

17

dedication formula found in Burnsville City Code section 11-4-8.E to arrive at $37,804, however, did not satisfy the individualized determination required by subdivision 2c(a) because the ordinance calculates the fee amount based on the *average* cost per acre by zoning district. *See* Burnsville, Minn., Code § 11-4-8.E ("such contribution shall be based upon land dedication requirement multiplied by the average cost per acre by zoning district as established, from time to time, by the city council"). The dedication formula itself does not relate the fee to the value of the specific land that would have been dedicated, thus it did not satisfy 2c(a). Accordingly, the City needed to make further findings to satisfy the individualized determination requirement.

But our analysis does not end here because the City took additional steps. The city attorney and other staff members later met and agreed to reduce the park dedication fee from $37,804 to $11,700, because, as noted above, section 11-4-8.E uses *average* commercial values to calculate the park dedication fee and the value of Puce's property is "less than what the City uses for commercial property average." Accordingly, the City valued Puce's land at $130,000 per acre, *based on the market value of his property*. Although the record does not show that this was a fair valuation of the property based on an independent appraisal, Puce concedes that the City recalculated the fee amount using the fair market value of his property, which was a "more accurate, current, and *individualized* figure." By applying the 5 percent figure that the City determined was a reasonable portion of land to be dedicated to the *actual value* of Puce's property, the City made an individualized determination and complied with the "rough proportionality" requirement of subdivision 2c(a). The City's imposition of a park dedication fee had a

18

sufficient legal and factual basis, and therefore it was not unreasonable, arbitrary, or capricious.[12]

## III.

We now consider whether the park dedication fee was lawful under Minnesota Statutes section 462.358, subdivision 2b(e). This issue again requires us to interpret a statutory provision, a task we do de novo. *Townsend*, 941 N.W.2d at 110.

As explained earlier, in *Collis*, we construed a "reasonable portion" of land to mean "that portion of land which the evidence reasonably establishes that municipality will need to acquire for the purposes stated as a result of approval of the subdivision." *Collis*, 246 N.W.2d at 26. Subdivision 2b(e), in turn, essentially codifies this interpretation, providing that "[t]he municipality must reasonably determine that it will need to acquire that portion of land for the purposes stated in this subdivision as a result of approval of the subdivision." Minn. Stat. § 462.358, subd. 2b(e).

---

[12]    The dissent's position would functionally prohibit municipalities from employing percentage-based ordinances, even when those ordinances are grounded in evidence that the municipality will reasonably need the amount of land or fee when a parcel is developed. Requiring specific findings related to each development application would render these formula-based ordinances meaningless. Such a ruling would indeed thwart municipalities' goals of swift resolution and equal treatment of applications. Although we are troubled by the City's initial actions, namely treating the dedication fee as a rubber stamp, percentage-based formulas provide predictability to what would otherwise become an unpredictable process. Because the Legislature has granted municipalities broad authority to enact ordinances that provide for the dedication of a "reasonable portion" of any proposed subdivision to the public and for public use, Minn. Stat. § 462.358, subd. 2b(a), we decline to strike down every ordinance that uses a percentage-based formula without a specific directive from the Legislature.

19

The district court did not determine whether the imposition of a park dedication fee violated subdivision 2b. The court of appeals held that, in order to comply with the provisions of subdivision 2b, "a municipality may impose a park-dedication fee only if the municipality reasonably determines that it will need to acquire and develop or improve a reasonable portion of land as a result of the municipality's approval of a subdivision." *Puce*, 971 N.W.2d at 294. The court of appeals found that the City's imposition of a park dedication fee violated subdivision 2b(e) specifically. *Id.*

We agree that to comply with the provisions of subdivision 2b, a municipality must make a reasonable determination that it will need to acquire and develop or improve a reasonable portion of land due to the municipality's approval of a subdivision before imposing a park dedication fee. But, contrary to the court of appeals, we find that the City did so here.

The City's park dedication formula first describes how the amount of land to be dedicated is determined. For commercial and industrial district developments, 5 percent of the gross land area is to be dedicated. Burnsville, Minn., Code § 11-4-8.E. But when the City elects to accept a cash fee, that fee is calculated by multiplying the average cost of the land by *the land dedication requirement*. *Id.* There must have been a reasonable determination that the portion of land that *would have been dedicated* was reasonable under subdivision 2b(e) because the City's fees are directly based on this determination. Based on its ordinance, the City was required to show that it reasonably determined that it needed 5 percent of the gross land area of the development to be dedicated as a result of the approval of Puce's subdivision.

20

Before this court, the City presented evidence that it reasonably requires 5 percent of newly developed land to maintain open space based on its 2040 comprehensive plan.[13] For example, the comprehensive plan set the goal of maintaining "a minimum of 2 acres of public open space for every 1,000 persons," and projected that the population of Burnsville will grow by 6,592 people by the year 2040. Further, the City projects it will add 172 acres of new business, retail, and office use by 2040, resulting in 2257 to 3761 jobs, or 13–22 jobs per acre. The City pointed to population, job growth, and development projections to support its determination that 5 percent was a reasonable amount of gross land area to require be dedicated through its ordinance in an effort to maintain open space in proportion to these projections. As noted, legislative decisions of this nature are typically subject to an arbitrary and capricious review. *Sabes v. City of Minneapolis*, 120 N.W.2d 871, 875 (Minn. 1963) ("In reviewing the proceedings of the municipality it is not the court's function to pass on the wisdom of the [decision], but only to determine whether the council exercised an honest and reasonable discretion, or whether it acted capriciously, arbitrarily, or oppressively. For us to assume greater responsibility would constitute an unconstitutional usurpation of nonjudicial power." (footnotes omitted)). In our deferential review, we hold that the comprehensive plan supports a reasonable

[13] The City presented evidence of its comprehensive plan. Puce does not object to the City's reliance on the comprehensive plan itself, only that it contains "vague, generalized projections about population changes and economic possibilities." Puce therefore forfeited any objections to our consideration of the plan itself. *See Thiele v. Stich*, 425 N.W.2d 580, 583 (Minn. 1988). Likewise, the plan is publicly available, and it is an appropriate document for us to take judicial notice of. *See Eagan Econ. Dev. Auth. v. U-Haul Co. of Minn.*, 787 N.W.2d 523, 530 (Minn. 2010).

21

determination to require 5 percent of the gross land area of the development. The City therefore reasonably determined that it would need 5 percent of Puce's land, or the monetary equivalent, as a result of the approval of his subdivision.

In sum, the City's imposition of a park dedication fee had a sufficient legal and factual basis under section 462.358, subdivisions 2c(a) and 2b(e) and our decision in *Collis*. Therefore, it was not unreasonable, arbitrary, or capricious.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings.

ANDERSON, Justice (concurring in part, dissenting in part).

The actions taken by the City of Burnsville (the City) raise serious constitutional implications that courts continue to grapple with in light of the United States Supreme Court precedents *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013) interpreting the Fifth Amendment to the United States Constitution. *See, e.g.*, *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 67 F.4th 816 (6th Cir. 2023). But given that the court of appeals properly did not reach the constitutional questions potentially at issue here, and the limited nature of our grant of review, our decision here turns on our interpretations of two statutory provisions: Minn. Stat. § 462.358, subds. 2c(a), 2b(e) (2022). For the reasons that follow, I agree with the court in part and disagree in part.

The issue before us is whether the City imposed a lawful financial condition on a land development permit issued by the City to a property owner. A statutory city has no other powers beyond those conferred by statute or implied as necessary in aid of those powers which have been expressly conferred. *Harstad v. City of Woodbury*, 916 N.W.2d 540, 545 (Minn. 2018). According to Minnesota Statutes section 462.358, subdivision 1a (2022), municipalities "may by ordinance adopt subdivision regulations establishing standards, requirements, and procedures for the review and approval or disapproval of subdivisions." Municipalities "may require that a reasonable portion of the buildable land . . . of any proposed subdivision be dedicated to the public or preserved for public use"

for specific reasons including parks, trails, or open space. Minn. Stat. § 462.358, subd. 2b(a) (2022). Subdivision 2b(e) of section 462.358 provides that a "municipality must reasonably determine that it will need to acquire that portion of land for the purposes stated in this subdivision as a result of approval of the subdivision." Municipalities may also "choose to accept a cash fee based on fair market value of the land" for redevelopment of developed land. Minn. Stat. § 462.358, subd. 2b(c) (2022). Most importantly for this appeal, for the regulations to be valid, "[t]here must be an essential nexus between the fees or dedication imposed under subdivision 2b and the municipal purpose sought to be achieved by the fee or dedication. The fee or dedication must bear a rough proportionality to the need created by the proposed subdivision or development." Minn. Stat. § 462.358, subd. 2c(a).

Here, the City's ordinance requires all land developers "to contribute lands . . . to be dedicated to the public for their use as either parks, playground, public open space, trail systems, water ponding, public lands or to contribute an equivalent amount of cash." Burnsville, Minn., Code § 11-4-8.A (2022). The condition on land development is based on the following provision in the ordinance:

> The dedication formula for commercial and industrial district development shall be five percent (5%) of the gross land area. Where the city council elects to take cash in lieu of land, such contribution shall be based upon land dedication requirement multiplied by the average cost per acre by zoning district as established, from time to time, by the city council.

Burnsville, Minn., Code § 11-4-8.E (2022). The City calculated the fee to be paid by the developer based on the authority provided by these two ordinance provisions.

Whether the City complied with Minn. Stat. § 462.358, subd. 2c(a), turns on evaluating if the City met its burden of proving the following: (1) that there is an "essential nexus" between the financial burden imposed on the property owner and the purpose to be achieved by the municipal fee, and (2) that the fee bears a "rough proportionality to the need created by the proposed subdivision or development." Minn. Stat. § 462.358, subd. 2c(a). Based on my review of the record, the City failed to meet its burden of proving the fee is roughly proportional to the need created by the proposed development. Therefore, I would conclude the City violated Minn. Stat. § 462.358, subd. 2c(a).

To begin, I concur with the court's interpretation of Minn. Stat. § 462.358, subd. 2c(a), and the statutory terms "essential nexus" and "rough proportionality." These terms, added by the Legislature in 2004, plainly show the Legislature's intent to incorporate the essential nexus and rough proportionality tests found in federal takings law to hold the government accountable when placing financial requirements on property owners during the property development process. *See* Act of May 10, 2004, ch. 178, § 3, 2004 Minn. Laws 241, 243. I disagree, however, with the court's application of the statute to the facts presented here. The tests of essential nexus and rough proportionality should not be interpreted to apply a minimal level of rational basis review; rather, the tests require, and thus the statute incorporates, standards that constitute "heightened constitutional scrutiny." *Koontz*, 570 U.S. at 620 (Kagan, J., dissenting) (describing the majority's extension of *Nollan* and *Dolan* as the extension of "heightened constitutional scrutiny"); *see also Dolan*, 512 U.S. at 391 (choosing to use the term "rough proportionality" to distinguish the test from "the minimal level of scrutiny" required by rational basis review).

Minnesota law first requires the City to prove an essential nexus between the fees imposed and the municipal purpose sought to be achieved by the fee. Minn. Stat. § 462.358, subd. 2c(a). In light of the facts of this proposed development, I agree that the City sufficiently met the required showing of an essential nexus. The City failed, however, to prove that the fee was roughly proportional to the need created by the proposed development.

The Legislature requires the City to establish "rough proportionality to the need created by the proposed subdivision or development." Minn. Stat. § 462.358, subd. 2c(a). As the court explains, and I endorse, "rough proportionality" incorporates the special meaning from *Dolan*, 512 U.S. at 391. In *Dolan*, the Court articulated the "rough proportionality" test by explaining that a "city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* Here, the City failed to show it made any "*individualized* determination." *Id.* (emphasis added).

The transcript of the relevant Burnsville City Council meeting suggests that the City interpreted the statute as authorizing imposition of a flat fee on a property owner to be used for "either parks, playground, public open space, trail systems, water ponding, public lands or to contribute an equivalent amount of cash." Burnsville, Minn., Code § 11-4-8.A. For example, during a hearing on the property owner's request for a permit, the city attorney admitted that he was unaware of any "actual land acquisition in the foreseeable future." And although the record contains a reference to a gap in a regional trail system, the record is otherwise devoid of any linkage between the fees paid by the property owner and park

development.  Without any additional showing, the problem with this approach, in addition to lack of consistency with the statutory language, is that it is impossible to evaluate whether the City has met the test of rough proportionality in evaluating the fee, or charge, and municipal need.

Here, the City and the court rely on the City's 5 percent formula found in the City's ordinances, alleging it can be supported by a city comprehensive study that projects population and community goals.  The City and the court point to the originally calculated fee of $37,804 and the subsequent reduction by the City to $11,700 as evidence that the City made an individualized determination because it used the actual value of the development property in the second calculation.[1]  Using a predetermined formula increases concerns relating to protecting property rights and calls into question whether a formula ensures an individualized determination.  *See Frank Ansuini, Inc. v. City of Cranston*, 264 A.2d 910, 914 (R.I. 1970) (holding a regulation requiring a dedication fee of at least

---

[1]    As an aside, that the City recognized that the originally assessed fee was unreasonable in light of the statutory requirements and thereafter reduced the assessment after the property owner complained shows commendable good faith on the part of the City in negotiating with the landowner but is not exactly a ringing endorsement of the municipal process used here.  The record provides no real support for either the original fee or the revised fee.  Acquiescing to the process used by the City here sends a message that other units of government can discount unreasonable fees or assessments after a property owner complaint and then point to the discount as evidence of an "individualized determination" despite the absence of a record of the municipality particularizing the fee to the proposed development.  *Cf. Koontz*, 570 U.S. at 605 ("Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation.").  Taken to extremes not demonstrated here, fee assessment policies can suggest possible coercion of aspiring land developers including homeowners and small business owners.  *See* Steven J. Eagle, *Koontz in the Mansion and the Gatehouse*, 46 Urb. L. 1, 15–17 (2014) (categorizing the different types of parties affected by exactions as "professional developers" and "principled landowners").

7 percent is "clearly arbitrary on its face"); Mark W. Cordes, *Legal Limits on Development Exactions: Responding to* Nollan *and* Dolan, 15 N. Ill. L. Rev. 513, 551 (1995) (explaining that "pre-set standards that do not provide for an individual assessment of development impact, such as where any development would be required to automatically pay a fee or dedicate a portion of land . . . would fail to meet *Dolan*'s requirement for an individualized assessment of development impact"). Although in *Collis v. City of Bloomington*, 246 N.W.2d 19 (Minn. 1976), we upheld the use of a formula in calculating exactions from property owners, it is unclear if the current statutory scheme passes constitutional muster after *Nollan* and *Dolan*; both of these decisions of the United States Supreme Court were decided long after we issued our opinion in *Collis*. Setting aside the constitutional issues, nothing in the record here shows how the owner's land value is relevant "to the need created by the proposed subdivision or development." Minn. Stat. § 462.358, subd. 2c(a). Thus, the use of a formula as applied does not establish how the fee bears a rough proportionality to the "*impact* of the proposed development." *Dolan*, 512 U.S. at 391 (emphasis added).[2] Put another way, the use of a formula that includes

---

[2]    To support its reasoning, the court cites to *Trimen Development Co. v. King County*, 877 P.2d 187 (Wash. 1994). In *Trimen*, the court was not interpreting a statute that used the term "rough proportionality." Even if, indirectly and by analogy, *Trimen* provided some guidance here, the record in *Trimen* is more favorable to the municipality than the record in this dispute. The developer in *Trimen* "proposed a recalculation of the fee in lieu of dedication that reduced the fee from the level suggested by the County," which the county accepted. *Id.* at 190. The developer also paid the recalculated fee "without protest" and did not challenge the fee until after it obtained final approval of its plan. *Id.* Additionally, "[t]he County's review of the documents for [the developer]'s subdivisions indicated that there was sufficient flat, dry, and obstacle-free space available for onsite dedication." *Id.* at 189. The court in *Trimen* noted that the "proposed subdivisions, with an expected occupancy average of 3 people per each of 112 potential residential units,

only the value of the land is not enough to adequately show that the City made an individualized determination that meets the required rough proportionality test.

The court argues that, in dissent, I would invalidate percentage set asides (or fee equivalents) for park dedications. Not so, or at least, not on this record. For purposes of this appeal, I contend that without more particularity, the City's assessment looks more like a generalized tax, something a developer cannot be coerced to pay individually. *See Knight*, 67 F.4th at 825 (explaining how some conditions on a permit could be the "type of coercion [that] falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that 'the public as a whole' should pay for." (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960))).

The city attorney recommended the $11,700 fee, conceding that the amount is "subject to argument whether it is defensible and reasonable," but urging that the fee was "in the ballpark," particularly after the City's adjustment of the amount.

*Dolan* held that although a mathematical calculation is not required in making an individualized determination, there must be "some effort to quantify its findings in support

---

created a need for an additional 2.52 acres of park land" and that the land developer "was fully aware that any fees paid would be applied in the park service area and would benefit the residents of its developments." *Id.* at 194. The ordinance defined the park service area "as an area roughly approximate to elementary school boundaries, within which reservation or dedication of land and fees are received and used for the benefit of residents within that area." *Id.* at 189. The record here contains nothing like the detailed analysis conducted in *Trimen* and a different history of negotiations was conducted in which the developer and the county engaged in a back-and-forth negotiation to dedicate land for open space. *See id.* at 190. Here, the City was under the impression it was entitled to apply a formula for calculating the required fee to be paid by the property owner without any analysis as to what purpose was addressed by payment of the fee.

of the dedication" that is more than a "conclusory statement." 512 U.S. at 395–96. The City's explanation here is simply that—a conclusory statement with no facts particularized to the development. The record before us lacks any findings by the City that $11,700, the amount resulting from the City's calculation, was roughly proportionate to the needs created by the owner's development. Before our court, the City offers various rationales to support its imposition of a park dedication fee, including lost open space, the intensifying use of the land, the increasing structural and impervious surface coverage, and the elimination of natural resources. Whether these general statements about municipal development justify the park dedication fee presents an interesting question we need not answer here; it is sufficient to note that nothing in the record before the court connects the $11,700 payment by the landowner to these municipal needs. Put another way, the City here did not make any attempt to "make some effort to quantify its findings." *See id.* at 395.

Without an individualized determination, the City's fee imposition does not comport with subdivision 2c(a) and fails as a matter of law.

I take no position on whether $11,700 was an unreasonable fee. The City is well equipped to make these determinations. But on this record, I cannot say that the City participated in the individualized determination that subdivision 2c(a) requires. In *Collis*, we were concerned with a fee formula that "does not consider the relationship between this particular subdivision and recreational need in the community" and municipalities using "dedication regulations to exact land or fees from a subdivider far out of proportion to the needs created by his subdivision in order to avoid imposing the burden of paying for

additional services on all citizens via taxation." 246 N.W.2d at 26–27. The addition of subdivision 2c directly addresses these concerns by setting more stringent requirements for impositions of park dedication fees. The Legislature clearly sought to provide further protections to property owners by requiring an essential nexus and rough proportionality.

At a minimum, the requirements of subdivision 2c(a) ensure that municipalities that use a percentage-based or other formula to calculate park dedication fees do not impose arbitrary formulas. On this record, I cannot conclude that an individualized determination, as required by subdivision 2c(a), was made that tied the needs that this proposed development would create to the fee that the City imposed.

Because the park dedication fee was unlawful under subdivision 2c(a), I need not consider whether the court of appeals erred when it determined that the fee was also unlawful under subdivision 2b(e). Based on this record and arguments made by the parties, and without subdivision 2b(e) specifically incorporating the constitutional tests that were incorporated by subdivision 2c(a), it is not necessary to determine whether the City made a reasonable determination that it would need to acquire a portion of the development property.

In conclusion, I dissent in part because the City failed to show rough proportionality as required to support its reasoning for the park dedication fee. The park dedication fee, or exaction, the City seeks to impose on the property owner at best "reflect[s] a sincere government effort to require developers to pay for the costs development places on the surrounding community." Cordes, *supra*, at 513. But "[a]t its worst the system [is] a means

by which governments can use their monopoly power to extort from developers property interests often unrelated to the proposed development." *Id.* at 513–14.

To allow the government to implement automatic exaction fees without an individualized determination relating to the needs created by the proposed development would be to allow "grand theft." *Collis*, 246 N.W.2d at 26.

For these reasons, I respectfully concur in part and dissent in part.


GILDEA, Chief Justice (concurring in part, dissenting in part).

I join the concurrence in part and dissent in part of Justice Anderson.